In re SNIDER FARMS, INC., Debtor(s).

Bankruptcy No. 87–60512.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division,
at Gary/Lafayette,

Oct. 19, 1987.

Gordon E. Gouveia, Merrillville, Ind., for debtor.

David Thuma, Indianapolis, Ind., for Equitable Life Ins.

Richard Browne, Valparaiso, Ind., for Northern Ind. Bank & Trust.

## MEMORANDUM OPINION AND ORDER

KENT LINDQUIST, Chief Judge.

### I

### Statement of Proceedings

This case came on for partial hearing on August 20, 1987 adjourned to September 11, 1987 for an additional partial submission on objections to Debtor's Chapter 12 plan filed June 24, 1987.

The objections to said plan were as follows:

1. Objection by Equitable Life Assurance Society of the United States (hereinafter: "Equitable") filed July 28, 1987.

2. Objection by Northern Indiana Bank and Trust Company (hereinafter: "NIB") filed July 28, 1987.

3. Report of Chapter 12 Trustee, Paul R. Chael (hereinafter: "Trustee") filed August 3, 1987 which was treated as an objection for purposes of the confirmation hearing.

The plan hearing was consolidated with a hearing on the Motion of Equitable for Stay Relief filed April 27, 1987 for lack of adequate protection. The Court by its Order dated July 9, 1987 provided that if the Debtor's plan was confirmed at the plan

hearing, the Motion for Stay Relief would be moot but that if the Debtor's plan was denied confirmation, the evidence submitted on rental value of the Debtor's property would be considered by the Court in determining what adequate protection payments should be paid by the Debtor to Equitable until this case was dismissed, converted, or the Debtor's plan was eventually confirmed.

The Trustee's objection that the Debtor's plan did not contain a liquidation analysis so that it could be determined that the Debtor's plan met the best interest of creditors test pursuant to § 1225(a)(4) was resolved by an oral stipulation between the Trustee and the Debtor in open Court on September 11, 1987 in which the parties stipulated that the net liquidation value of the Debtor's unencumbered assets after allowing for all valid liens, priority claims, and administrative expenses (there being no allowed exemptions inasmuch as the Debtor is a corporation) was $20,000.00. The Debtor agreed to make plan payments annually over the three years of the plan to the unsecured creditors in the sum of $20,000.00 with a discount factor of 6%. Equitable which had also objected to the plan on the same grounds, conditionally agreed to join in the stipulation of the Trustee and the Debtor on the grounds that the Trustee examine the loan and security instruments of the other secured creditor in the case, NIB, and report to the Court that his examination thereof revealed that NIB had a valid and properly perfected security instruments securing its claim. The Trustee and the Debtor agreed to this condition.

The objection of NIB was resolved by an oral stipulation entered into between the Debtor and NIB in open Court on August 20, 1987 and which was accepted by the Court. Pursuant to that stipulation, the Debtor and NIB agreed that the terms of any plan that might be confirmed would provide as follows relating to NIB on its two secured loans:

1. As to the real estate mortgage by Debtor to NIB on 56 acres of farmland, the allowed amount of NIB's secured claim would be $650.00 per acre for a total of $36,400.00 payable over 30 years at a discount rate of 9%, with an annual payment of $3,543.00.

2. As to the security interest held by NIB in the Debtor's equipment, the allowed amount of NIB's secured claim would be $82,500.00, payable over 7 years, at a discount rate of 9% per annum with an annual payment of $16,353.00.

3. That except as modified above the terms and conditions of the loan and security instruments executed by the Debtor to NIB would remain the same and no entity other than the Debtor would be discharged pursuant to any confirmed plan which has been successfully consummated.

Thus, the remaining issues to be resolved in this case relate solely to Equitable's Objection to Confirmation and Motion for Stay Relief.

The Debtor's plan at Article III, 3.3, Class III provides that the Debtor will pay the secured claim of Equitable in the sum of $424,200 in annual payments over 30 years at an interest rate as determined on the date of confirmation equal to the interest rate on government treasury bonds with a maturity date closest to January 15, 1988 or 30 years from January 15, 1988, the date of the first proposed annual payment under the plan.

The Debtor's plan also provided that in the event the Debtor should sell any portions of the property subject to Equitable's lien the net proceeds shall be paid to Equitable as follows: one-half of any such proceeds shall be applied to the next annual principal payment excluding interest. If the proceeds are in excess of the next annual payment they are to be applied against the succeeding annual payment until paid in full, with the remaining one-half of any such proceeds to be applied to the principal amount of the debt.

The objection of Equitable asserts that it holds a first mortgage lien against 606 acres of the Debtor's property which is secured by an indebtedness of $784,411.86

owed by the Debtor as evidenced by its proof of claim.

Equitable objected to the plan on the following grounds:

1. The value of $424,200.00 assigned by the Debtor to the real estate does not reflect the actual value of the real estate in violation of § 1225(a)(5)(B) in that Equitable will not receive the present value of its allowed secured claim.

2. The interest rate provided for in the Debtor's plan is inadequate and does not compensate Equitable for the risks inherent in the Debtor's plan in violation of § 1225(a)(5)(B).

3. The Debtor's plan does not provide for adequate protection of Equitable's secured claim during the term of the plan.

4. The Debtor's plan is not feasible.

5. The Debtor's plan does not comport with the requirements of the Fifth Amendment to the United States Constitution based on the Debtor's treatment of Equitable's claims.

The Debtor and Equitable orally stipulated in open court on August 11, 1987 that the note and mortgage executed in favor of the Debtor to Equitable was genuine and valid and was a properly perfected first lien on the property in question subject to real estate taxes. The parties further stipulated that the balance due was at a *minimum* of $630,000.00, with Equitable reserving the to litigate whether their claim was in excess thereof. The parties further stipulated that in the event a plan was confirmed the terms and conditions of Equitable's note and mortgage would remain the same except as to the secured portion of the claim and the interest rate and that no entity other than the Debtor would be discharged by the successful consummation of any confirmed plan. Finally, the parties stipulated that the interest rate on a thirty year treasury bond at the time of the commencement of the hearing was 8.98% per annum.

## II
### Findings of Fact

The president of the Debtor, David Snider (hereinafter: "Snider") related there were four tracts of land owed by the Debtor, subject to Equitable's lien. These were as follows:

| | | |
|---|---|---|
| 1. | Parcel one: | 160 acres (159.08 acres per Equitable appraisal). |
| 2. | Parcel two: | 170 acres |
| 3. | Parcel three: | 77.08 acres |
| 4. | Parcel four: | 200 acres |

Snider testified that the four parcels totaled 606 acres and that slightly over 570 acres were tillable, after deducting roads, ditches, pasture land and woods. Snider opined that the 606 acres could be sold for $600.00 an acre which would be a total of $363,600.00. The plan provides for a value as to Equitable's allowed secured claim of $424,200.00 for the 606 acres which comes to $700.00 an acre.

Snider further testified that the gross, cash rental value of said property as to the tillable acres was $70.00 an acre. Snider stated that the Debtor is presently leasing 100 acres of contiguous farm land for $60.00 an acre which it had leased for $70.00 an acre last year, 75 acres of which was tillable, and that the Debtor was also leasing 50 acres, one and one-half miles from the Debtor's present operations for $50.00 a year, all of which was tillable. Snider related that this leased land was not quite as productive as his own land overall.

It was stipulated by the parties that cash rent leases are gross leases in which the landlord pays all real estate taxes, insurance, liming expenses and ditch maintenance and repairs. The parties further stipulated that the average expenses to the landlord on such a gross lease was $12.00 per acre.

The Debtor also called Edward T. Campbell as its expert who appraised the 606 acres in question and opined it had a value of $700.00 an acre or a total value of $424,000.00. By stipulation of the parties Campbell's written summary of his appraisal was admitted into evidence as Debtor's exhibit no. "1".

Campbell's written summary stated three approaches to value are considered in rural appraisals: 1) market data approach, 2) cost approaches, and 3) earning approaches. Campbell only used the market data approach in the appraisal and stated in a written report that he only used the market data approach as the other two approaches are not realistic in appraising agricultural land. He further stated that the income approach by which net income based on typical yields, price and expenses, is capitalized, the capitalization rate being derived from the market using the average actual net returns from similar properties, was not applicable for the reason that because of the changes in the costs of producing crops, crop yields and the prices of grain an accurate estimate of net income is difficult to obtain. In addition, Campbell noted that with the very low capitalization rate, as indicated by comparable sales in the area, a very minor change in the net income estimate or in the capitalization rate results in a significant change in the value of the farm by this approach. Campbell concluded that farms in the general area, at the present time, are not producing sufficient net income to repay a maximum loan that could be obtained on the property to complete a purchase (i.e. pay the debt service on the loan) let alone provide a return on the owner's equity in the property. As a consequence, it appeared to Campbell that several other factors are being considered by prospective buyers in considering the purchase of agricultural land in Porter County other than net return on investment. Campbell concluded on the basis of the five comparable sales made in 1987, all located in the same county as the Debtor's farm that the fair market value of the 606 acres was $424,000.00. Soil types were based on information obtained from the Indiana Soil Conservation Service but a comparison of soil types was not made for the purpose of making any adjustment in the comparables. Adjustments were made for 1) time of sale, 2) size, 3) location, 4) family, and 5) improvements set out in his written summary. The appraisal did not break the fair market value down by parcel or set out a specific amount as to the contributory value of the improvements.

Campbell also testified regarding the income test and made the following valuation based on that test using the following approaches based on the Debtor's summary of operations and assuming 556 tillable acres.

1. 307 acres of beans at 40 bushels an acre × $4.90 a bushel or $60,172.00.

2. 162 acres of corn at 130 bushels an acre × $1.91 a bushel or $40,224.60.

3. 87.5 acres in government set-aside or diversion program— $10,346.39.

| | |
|---|---|
| Gross Profit | $110,742.00 |
| Less Projected Expenses | $ 74,800.00 |
| Net Income | $ 35,942.99 |

By dividing the net income by the 556 tillable acres, Campbell projected a net income of $64.65 per acre. Campbell assigned a 9% capitalization rate to this net income based on fair market value of $691.00 and arrived at a value of $716.67 an acre or $398,468.52 (556 tillable acres × $716.67) based on the income approach. The basis for the capitalization rate was not fully explained other than Campbell opined that there were other alternative investments presently available in the market that could bring this return, i.e. the opportunity cost of money. To this figure Campbell stated he would add $20,000.00 to $25,000.00 for the contributory value of the improvements, and $300.00 an acre for the non-tillable land. Assuming the improvements to be valued at $22,500.00 and the 50 non-tillable acres to be valued at $15,000.00, the total value based on the income approach would be $435,968.52 or $11,968.52 higher than his opinion of the fair market value based on the market data approach of $424,000.00. This would result in assigning an average price per acre for the 606 acres as $718.87 as opposed to $700.00 an acre based on the market approach, and is in excess of the value proposed in the Debtor's value in his plan of $424,200.00 by $11,768.82.

Campbell stated he did not physically examine the comparable sales parcels or discuss the sales with the seller and buyers, and that flooding, drainage, types of soil, yields, and the number of tillable acres would affect the adjustments that should

be made on the comparables as well as locality, and how current the sales were, but that as long as yields were within an acceptable range, the difference in yields should not be considered in the market approach as this can often be attributable to the skill of the farmer rather than to the productivity of the land.

Campbell opined that the gross rental value of the Debtor's tillable acreage was in the range of $70.00 to $73.00 based on a gross, cash lease.

Equitable called Allan Orr (hereinafter: "Orr") as its expert witness to render an opinion as to the value of the Debtor's 606 acres subject to the Equitable lien. Orr's written summary of his appraisal was admitted into evidence as Respondent's Exhibit "D" by stipulation of the parties.

Orr based his appraisal exclusively on the market data or comparable sales approach and rendered his opinion as to the fair market value on that basis. The value arrived at by Orr was based on what the liquidation value would be to Equitable as lienholder in an attempt to satisfy its secured debt.

Orr assigned a total fair market to the four parcels consisting of 606 acres of $593,175.00, or an average of $978.84 an acre, using some thirteen comparable sales with adjustments. Seven of the thirteen comparable sales were made in 1987. Adjustments were made to the comparables based on time, size, location, land and improvements, but not as to the terms of the sales. Campbell's five comparables were all made in 1987.

At page 21 of Orr's appraisal the methodology used by Orr in making adjustments to comparable sales based on the date of sale is set out whereby an index is set out (1977 equals 100). An index based on *Agricultural Land Values*, Economic Research Service, USDA, and the Federal Reserve Bank of Chicago 1986 Agricultural letter was given as the source of the data used to develop the index. A second index, an Indiana Index, which gives a monthly index developed by Dr. Robert Suter, Purdue University is also set out. Based on this index Orr asserts that sales made in previous years can be accurately used as comparables.

The breakdown of Orr's market approach by parcel was as follows:

| 1. | Parcel one: | 159.08 acres | 163,050.00 |
|---|---|---|---|
| 2. | Parcel two: | 170.00 acres | 16,750.00 |
| 3. | Parcel three: | 77.08 acres | 69,375.00 |
| 4. | Parcel four: | 200.00 acres | 195,000.00 |
| | TOTAL | | $593,175.00 |

Orr asserted that buyers who intend to actually operate a farm operation typically look for a rate of return or capitalization rate in the 5 to 7% range while pure investors who buy strictly for investment return want a return in the 8 to 10% range.

According to Orr another way to view the value of land is the rental rate in relation to or as a percentage of the fair market value.

Orr declared that the subject property would have a gross rental value in the range of $65.00 to $75.00 per tillable acre.

Orr stated that according to studies done by the Purdue University Agricultural Department in 1985, on the average, rent as a percentage of fair market value was 7.5% while the percentage in 1986 was 8.2%. Orr expected the rate to be lower this year.

Thus, another way to develop a value for farm land is to capitalize the net rental income per acre before personal income taxes. For instance, if gross rental is $75.00 an acre and average expenses to the landlord under a gross cash lease are $12.00 an acre, this yields a net rental income of $63.00 per acre. Given a capitalization rate of .075%, the value of the land would be $840.00 an acre (The Court selected this assumed capitalization rate based on the range of rates given by Orr for the purpose of testing the values reached under the market approach by the income approach). Orr assumed there were 561 tillable acres rather than 556 as estimated by Campbell. Assuming 561 acres are tillable and 45 as non-tillable, the value of the tillable land using the income approach based on net rentals of $63.00 per acre with a .075% capitalization rate would be $471,-240.00 ($840.00 an acre × 561 acres). If

the contributory value assigned to the improvements is $24,170.00 as asserted by Orr (Campbell assigned $20,000.00 to $25,-000.00 to the improvements), and the 45 non-tillable acres have a value of $300.00 per acre or $13,500.00, the total value of the land based on the income approach would be as follows:

| | |
|---|---|
| Rental Value—tillable acres | $471,240.00 |
| Improvements | $ 24,170.00 |
| Value-non-tillable acres | $ 13,500.00 |
| Total Value | $508,910.00 |

This would result in overall average on 606 acres of $839.79 as opposed to a total value of $593,175.00 or $978.84 an acre assigned to the property by Orr using the fair market value approach.

Equitable's final witness was Dr. Robert C. Sutter, (hereinafter "Sutter") a professor of economics at Purdue University, and owner of an agricultural consulting business. Sutter was called upon to express his opinion as to the methodology used by Campbell and Orr in arriving at their appraised values.

Sutter noted that Campbell failed to compare the soil types between the subject property and the various comparables used by him, and that some of Campbell's comparables were located in the flood plains of the Kankakee River, while the subject property was located considerably higher above sea level and not subject to flodding as were some of his comparables. This analysis was based on soil survey maps of Porter County, Indiana, prepared by the USDA in conjunction with Purdue University and the Indiana Department of Natural Resources.

On the other hand, Sutter opined that Orr's adjustments as to the comparables were done in a more conventional manner and were proper in using the market approach.

When queried by the court whether an income approach or an approach based upon valuation for estate tax planning purposes (not for probate purposes) might be a better gauge for valuing the land of a chapter 12 debtor who is attempting to reorganize as a going concern rather than fair market value under the comparable sales approach, Dr. Sutter declared the fair market value approach was the more accurate and preferential approach.

Sutter declared that a fair rental for the Debtor's tillable land would be $87.80. This is based on a formula using 115 bushels of corn per acre at .72 a bushel. This figure was projected based on a weighted yield and analysis of the soil maps for the Debtor's property.

### III

**Conclusions of Law and Discussion**

11 U.S.C. § 1225(a)(5) provides as follows:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

\* \* \* \* \* \*

(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
 (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder; and

There is no legislative history of any consequence to enlighten the court if Congress had any intention as to how value is to be determined in a Chapter 12 case pursuant to the foregoing provisions. It is noted however that § 1225(a)(5) is identical to § 1325(a)(5) that was in effect prior to the passage of § 1225(a)(5). In fact Chapter 12 is basically modeled after Chapter 13. Thus, Chapter 13 case precedents provide a valuable tool for interpretation of chapter 12 because of the identical language. *In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125, 126 (Bankr.D.Mont.1987); *In re Beyer,* 72 B.R. 525, 527, n. 1 (Bankr.D.Colo.1987).

It is also noted that the "cramdown" provisions of Chapter 11, § 1129(b)(2)(A)(i) relating to the "fair and equitable" treatment of secured claims includes the following requirements;

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

This language is substantially similar to and has the same purpose as § 1225(a)(5), and thus the legislative history and the cases interpreting this section may also be helpful to the court in analyzing § 1225(a)(5) as well as those interpreting § 1325(a)(5), although care must be exerted in analyzing the applicable Chapter 13 cases because of the higher interest rates normally involved in consumer cases and the nature of the collateral involved.

In addition § 506(a), as implemented by Bankr.R. 3012, must be considered by the court. This section is made applicable to Chapter 12 by virtue of § 103(a) which provides that "Except as provided in Section 1161 of this title, chapters 1, 3 and 5 of this title apply in a case under Chapters 7, 11, 12 or 13 of this title."

Section 506(a) states as follows:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.* (Emphasis added).

The legislative history to § 506(a) indicates that no fixed approach to valuation was contemplated. The House Report states as follows:

'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interest in the case. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 356 (1977), *reprinted* in 5 U.S.Code Cong. & Admin.News 5787, 6312 (1978).

The Senate Report on § 506(a) states as follows:

While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. S.Rep. No. 95–989, 95th Cong., 2nd Sess. 68 (1978), *reprinted* in 5 U.S.Code Cong. & Admin. News 5854 (1978).

Accordingly, valuation for the different purposes of determining adequate protection under § 361, or to determine if the Debtor has met the "best interest of creditors" test under Chapters 11, 12, or 13, may require the Court to employ different valuation criteria than for "cramdown" purposes under § 1225(a)(5), § 1325(a)(5) or § 1129(b). That is, the focus of inquiry as to any value determination must be on the interests that a particular Code section is designed to protect and valuation must be made with regard to those purposes. 3

*Collier on Bankruptcy,* ¶ 506.04 (15th Ed. 1986).

Thus, the treatment of secured creditors and the valuation of property subject to liens in a "cramdown" hearing to confirm a plan over the objections of a secured creditors under Chapter 11, 12, and 13 must be distinguished from valuation for adequate protection purposes which covers the period between the date of the petition and the confirmation of the plan.

As a matter of background it should be noted that in a Chapter 11 or 13 case, §§ 361, 362 and 363 control as to what adequate protection, if any, should be paid by the Debtor to the secured creditor; however, in a Chapter 12, adequate protection as to farmland is governed by § 1205(a) and (b)(3) which provides as follows:

(a) Section 361 does not apply in a case under this chapter.

(b) In a case under this chapter, when adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

\* \* \* \* \* \*

(3) paying to such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property; ...

The above provision was a direct congressional reaction to the many courts who followed the cases of *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984), and *Grundy National Bank v. Tandem Mining Corporation,* 754 F.2d 1436 (4th Cir.1985), in which a farmer in Chapter 11 was required to pay pursuant to § 361, at least to undersecured creditors, their "lost opportunity costs" as adequate protection even though the unimproved farm land was not depreciating. It was thought that rental value would be a good indicator of the value of the secured creditor's interest in the property which needed to be protected. However, Congress mandated the use of fair rental value only in the context of *adequate protection* and did

not expressly extend this standard for the purposes of determining the amount of a creditor's allowed secured claim under § 1225(a)(5) at the plan confirmation stage which is identical to § 1325(a)(5).

The legislative history to § 1205 is as follows:

Accordingly, section 1205 of the conference report provides a separate test for adequate protection in Chapter 12 cases.

It eliminates the need of the family farmer lost opportunity costs, and adds another means for providing adequate protection for farmland—paying reasonable market rent. Section 1205 eliminates the "indubitable equivalent" language of 11 U.S.C. 361 and makes it clear that what needs to be protected is the value of the property, not the value of the creditor's "interest" in property.

Joint Explanatory Statement of the Committee of Conference, *reprinted in* 134 Cong.Rec. H8999 (daily ed. Oct. 2, 1986).

■ There appears to be nothing in the Code or its legislative history, nor in existing case law in this circuit, that mandates that the Court consider only the fair market value of the property, using the market or comparable sales approach in determining the value of an allowed secured claim for "cramdown" purposes under § 1225(a)(5), § 1325(a)(5), or § 1129(b)(2)(A)(i), particulary when the Debtor's plan is one of reorganization of a going concern and not one of liquidation. As a matter of fact, the Seventh Circuit in the Chapter 11 case of *In re Potter Material Service, Inc.,* 781 F.2d 99 (7th Cir.1986) in discussing the value of a debtor's business stated as follows:

The Supreme Court set out the appropriate standard for evaluating a company undergoing reorganization in *Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941). The Court said:

The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if

the allocation of securities among the various claimants is to be fair and equitable. Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on *an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth,* including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance. *A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate* . . . . The Circuit Court of Appeals correctly left the matter of a formal appraisal to the discretion of the District Court. *The extent and method of inquiry necessary for a valuation based on earning capacity are necessarily dependent on the facts of each case.*

*Id.* at 526–27, 61 S.Ct. at 685 (citations omitted).

The district court correctly made an informed judgment after looking at all the relevant facts in this case. The court based its valuation of Potter upon "the Debtor's past earnings record, the state of the economy, the highly competitive nature of the Debtor's business, the present financial position of the Debtor and the Debtor's projections of future earnings.

*Id.* at 104 (Emphasis added as to second emphasis only).

The only reported case this Courts research has revealed regarding valuation of the debtor's farmland in a Chapter 12 case for the purposes of confirming a plan is *In re Beyer,* 72 B.R. 525 (Bankr.D.Colo.1987).

There the debtor asserted that his farmland should be valued by a modified "income" approach by which the gross rental value of each acre was multiplied by 7, after adjustments for crop rotation requirements, to determine the "market value" of the property. (The reason why a multiplier of 7 was used was not stated although a method known as the Gross Income Multiplier approach is used at times whereby market value is divided by annaul rental and the annual income is then multiplied by this figure). The debtor cited the Congressional history to § 1205, *supra,* that the value of the debtor's land must be based on the rental value approach.

The Federal Land Bank ("FLB") submitted its appraisal using two approaches, the sales comparison approach and the income approach. The income approach entailed capitalizing anticipated future benefits from the ownership of the property into an indication of value. After estimating income the FLB appraiser capitalized the income to arrive at a value with a reference to comparable sales for the limited purpose of determining the capitalization rate. In arriving at his final figures the FLB appraiser relied primarily on the comparable sales approach but included the income approach to verify his analysis.

Although not set out in the opinion itself, the Court's examination of the appraisal prepared by Darrell Rennels, A.R.A. for the Farm Credit Service as to a certain 295.6 parcel of real estate, which is in the record of the *Beyer* case, reveals that Rennels determined that the market approach *and* the income approach would be used to estimate value, and that since the property had no improvements, the cost approach would not be helpful.

The income approach used was based on the relationship of the net income to the sales price of comparable properties that have been sold. Net income was estimated on a landlord basis and capitalized by an overall rate. Typical landlord expenses were real estate taxes and insurance. The landlord basis was considered by the appraiser to be the most reliable for the application of the income approach to rural property as fewer assumptions and judgments needed to be made.

In doing his income analysis, the appraiser established an average yield per acre for the subject property and comparable sales based on A.S.C.S. county average with ad-

justments for the specific properties. Unit prices were based on an average over three years.

As to the subject property in the *Beyer* case, the net income for the 295.6 acres (122 of which was fallow) was determined. This income figure was divided by the fair market value as arrived at by the comparable sales approach to arrive at a capitalization rate. The net income was then divided by the capitalization rate to arrive at a value based on the income approach.

The appraiser then compared the value arrived at by the market approach and that arrived at by the income approach. *Both* values were given consideration by the appraiser. The appraiser gave the market approach the most consideration. The income approach however, was considered to give additional support to the market approach estimate.

The Court rejected the approach of the debtor's appraiser and found the appraisal of FLB to be credible and adequately supported.

The Court stated as follows:

Generally, the interests to be considered in determining the amount of a claim for inclusion in a plan, where the continued use by the debtor of the property is obviously contemplated, is the right a creditor has to realization of the value of the property in which it has a security interest when its ability to realize that value is modified *See In re Van Nort,* 9 B.R. 218 (Bankr.E.D.Mich.1981). Simply put, what the Court is concerned with here is the problem of protecting the secured creditor's interest in the collateral, including the right to foreclose and realize the cash value of the collateral.

In light of these general guidelines, Beyer's argument on value determination for the purposes of plan confirmation must now be addressed. Although Beyer referred to the legislative history regarding reasonable rent as an adequate protection alternative in supporting his approach to valuation, he failed to explain how this comment on Section 1205 pertains to a Section 1225 valuation. He merely used this legislative history as an "assumption" in his appraisal. After reviewing this assumption, the Court is unable to find any plausible basis in law or in logic for Beyer's position. Merely because the legislature introduced a rental concept in adequate protection analysis does not require the Court to conclude that rental value now must be considered, and is, in fact, the only consideration, in every value determination in Chapter 12.

*Id.* at 527–528.

While the Court is in agreement with the *Beyer* Court in rejecting the debtor's multiplier-of-rent approach and that the criteria for adequate protection under § 1205 by use of rental values cannot be directly applicable in determining the amount of a secured creditor's allowed secured claim under § 1225, this Court sees no reason why the Court may not under § 1225 consider the income approach to farmland based on net income or net rentals per acre. Obviously, since this debtor-farmer is operating an on-going farm enterprise and is attempting to rehabilitate rather than liquidate, it would seem readily apparent that the true going-concern value of a farm operation, as any other business, would be somewhat dependent on the net income or rentals it would generate as *farmland* as opposed to farmland that may have a value in the market place based on factors other than its intrinsic economic value as farmland, i.e. an urban or suburban influence due to its particular location near a metropolitan area, or due to non-farmer speculators or investors who purchase such land for reasons *other* than merely the income or rentals it can generate simply as farmland.

It must always be remembered in absorbing the great mass of data supporting these appraisals that the debtor's purpose in having a plan confirmed is to reorganize and operate the farm as an on-going farm, i.e. this is its proposed use pursuant to § 506(a), and not for the myriad of other reasons which may drive the market value up to a point where it is obvious that a fair return on the land from farm operations is

not feasible. On the other hand, the Court must always keep in mind that the value assigned to the subject property must reflect the value of creditors interest in the land, i.e. the right to dispose of and realize on its collateral and reduce the same to cash.

Thus, the Court can perceive no reason why the method of valuing a debtor who is attempting to reorganize a going concern under Chapter 12 should be any different than valuing a debtor who is attempting to so reorganize in a Chapter 11, or Chapter 13. The Court in the recent Chapter 11 case of *In re Fiberglass Industries, Inc.,* 74 B.R. 738 (Bankr.N.D.N.Y.1987) addressed the issue of valuation for plan confirmation purposes and stated as follows:

Were the debtors contemplating an actual disposition of the collateral, valuation would be based upon the consideration that the estate would expect to receive therefor, assuming the consideration to be fai.. 3 *Collier on Bankruptcy,* ¶ 506.04[2] (15th ed. 1986). Where, as under the present plan, the debtors propose retention and continued use of the collateral, a forced sale or liquidation value of the collateral is inappropriate. *Matter of QPL Components, Inc.,* 20 B.R. 342, 345 (Bankr.E.D.N.Y.1982). The essential inquiry is what "value" does the collateral have to the estate. As was stated in *Matter of Crockett,* 3 B.R. 365, 367 (Bankr.N.D.Ill.1980), with regard to valuing a secured claim under a Chapter 13 plan, but equally applicable to valuing Dollar's claim under the proposed Chapter 11 plan:

Under a Chapter 13 plan the secured claim should be valued with due regard to the value of the property of the estate. '[T]he proposed disposition or use of such property' (Sec. 506(a)) in the instant case is for the debtors' retention and use. Therefore, the debtors cannot eat with the hounds and run with the hares. Seeking retention of the property, they cannot insist on liquidation values to be paid to the creditor ... The value of GMAC's secured claim under § 506(a) is enhanced by the continued use of

the collateral in effectuating the debtors' performance under the plan, which value must be reflected in distributions under the plan.

Justice Douglas, in part quoting Justice Brandeis, stated:

Value is a word of many meanings ... It gathers its meaning in a particular situation from the purpose for which a valuation is being made.

*Institutional Investors v. Chicago Milwaukee, St. Paul and Pacific Railroad Co.,* 318 U.S. 523, 540, 63 S.Ct. 727, 738, 87 L.Ed. 959 (1942) *reh'g denied,* 318 U.S. 803, 63 S.Ct. 980, 87 L.Ed. 1166 (1943). The principal purpose of the instant valuation is to assure fair compensation to Dollar [which will be deprived of access to its security for recovery on its claim while debtors continue to use and enjoy the benefits derived therefrom]. 3 *Collier on Bankruptcy* ¶ 506.04[2], (15th ed. 1986).

Since filing, the debtors have continued in possession of their assets and have continued to operate their business as debtors in possession pursuant to Code §§ 1107 and 1108.

\* \* \* \* \* \*

[t]he debtors intend to keep the business running as a going concern. As such, the Court will hold the debtors to a going concern standard with respect to valuing the collateral which they continue to use and retain.

*Id.* at 741–742 (Footnotes omitted).

The valuation of an on going business on a income approach can be done by projecting future earnings, averaging these earnings and capitalizing the same, *See, In re Dunlap,* 9 B.R. 921 (S.D.N.Y.1980), or future earnings can be projected and then these earnings can be discounted back to present value. *See, In re Jartran, Inc.,* 44 B.R. 331, 368–69 (Bankr.N.D.Ill.1984). As stated by the *Jartran* court: "The value of a firm for corporate reorganization purposes depends primarily on its earning capacity for, 'the commercial value of property consists on the expectation of income from it' ", *citing, Consolidated Rock Prod-*

*ucts v. DuBois*, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941).

Although, the use of these valuation methods often occur in the context of a § 1129(b) "cramdown" and the absolute priority rule where a valuation of the going concern of the business is necessitated to determine if the junior interests of subordinated debenture holders or equity stockholders will retain any value in the debtor, vis á vis senior unsecured creditors or to determine the value of stock distributed to unsecured creditors in lieu of cash, it nevertheless appears that the income method as to valuation retains its validity when applied in the context of "cramdown" under § 1225(a)(5) even where the absolute priority rule is not applicable, as it still reamins a well-established mode of valuing any on-going business enterprise, including a farm operation.

In attempting to reach a conclusion of law as to the correct standard of valuation to be used here (as opposed to a finding of fact as to the value of the property), the court is referred to an article by Dr. Robert C. Suter, P.H.D., in the Journal of the American Society of Farm Managers and Rural Appraisers, *The Capitalization of Income Revisited*, Vol. 51, no. 1, April, 1987. There hᵤ stated

The professional farm and ranch appraiser is visiting with several new clients today, ones involved in the areas of foreclosure, bankruptcy, and business interruption. If an appraisal is to serve in these kinds of cases, the judge, the jury, and sometimes a few others including the client, want to know (1) is the value of the property equal to or greater than the total of the outstanding loans plus the interest accrulas, and (2) is the income stream, the residual after paying all operating expenses, equal to or greater than the principal and interest payments.

Those are two questions every farm and ranch appraiser needs to answer when the reason for his appraisal is to file or critique a reorganization plan for a Chapter 11 or 12 bankruptcy. A farm or ranch appraisal which includes an esti-

mate of the subject property's earnings under the typical operator concept should answer both of these questions. And the same, under the present operator, is also desired.

\* \* \* \* \* \*

The income approach has been "in style" for a long time. It is still in style today. It may be more necessary in the remainder of the 1980s than at any time in the past three or four decades. It will not necessarily be more popular among appraisers, but it will be desired by many of our clients.

\* \* \* \* \* \*

*As the profession serves clients in the future an income statement, a capitalization of net income, and an earnings value for the typical operator will again be a major part of our appraisals.* Furthermore, with but minor changes in the data base we can have the same for the present operator anyone facing fianncial difficulty and/or for a Chapter 11 reorganization.

*Id.* at p. 20 (Emphasis added).

In discussing capitalization rates in the same article, Dr. Suter made the following comment:

Yes, the profession was having difficulty with the cap rate. Many of us decided to go to the market to establish the cap rate. That didn't help it merely provided a rationalization for the inflated values. We weren't clever enough to go, not to the land market, but to the money market and look at the opportunity cost of money. It is or should be the money markets that establish capitalization rates. And yet, even when some of us did attempt to establish a cap rate based on the market for money, we didn't always take the time to explain the methods we used to our clients.

In the late '70s, a group of students was forced to think about the opportunity cost of money. They started with a corporate bond, earning 9.0 percent. They compared that bond to farmland. They added....

1.5 percent for the lack of liquidity

1.5 percent for the additional risk, and 1.0 percent for management.

They got up to 13.0 percent. They then decided, bonds don't inflate but land does. So they subtracted 10 percent for inflation. Subtracting 10 from 13 left them with a 3.0 percent cap rate. And, that's how they got to a $3,600 farmland value. They then had in class an absentee-owner who had just purchased land. He was in the 50–percent tax bracket; and so they could have gone further, reducing the 3.0 to 1.5 percent. But let's remind ourselves of their basic assumption; they assumed, like many others, a ten percent rate of inflation, and in perpetuity.

*Id.* at p. 19.

Dr. Sutter also noted 26 U.S.C. § 2032A of the Internal Revenue Code relating to the valuation of farms and closely held business for estate tax purposes and stated:

The law futher states that current use value is to be determined by typical farm rental rates minus real estate taxes, the remainder of which is to then be divided by the farm mortgage interest rates used by the Federal Land Bank. All data are to be five-year averages. What is this? It's an income capitalization; it's an earnings approach to value.

*Id.* at p. 20.

 It is thus apparent that the income approach is another viable method that may at least be considered in going through the process of valuing income-producing farmland and has some applicability in that context just as it has applicable to non-farm business enterprises that have fixed assets which generate income. This is certainly the approach taken in the Internal Revenue Code.

26 U.S.C. § 2032A(e)(7) provides as follows:

(7) Method of valuing farms.

(A) In general. Except as provided in subparagraph (B), *the value of a farm for farming purposes shall be determined by dividing—*

(i) *the excess of the average annual gross cash rental for comparable land used for farming purposes* and located in the locality of such farm *over the average annual state and local real estate taxes for such comparable land, by*

(ii) *the average annual effective interest rate for all new Federal Land Bank loans.*

For purposes of the preceding sentence, each average annual computation shall be made on the basis of the 5 most recent calendar years ending before the date of the decedent's death.

(B) Value based on net share rental in certain cases.

(i) In general. If there is no comparable land from which the average annual gross cash rental may be determined but there is comparable land from which the average net share rental may be determined, subparagraph (A)(i) shall be applied by substituting "average annual net share rental" for "average annual gross cash rental".

(ii) Net share rental. For purposes of this paragraph, the term "net share rental" means the excess of

(I) the value of the produce received by the lessor of the land on which such produce is grown, over

(II) the cash operating expenses of growing such produce which, under the lease, are paid by the lessor.

(C) Exception. The formula provided by subparagraph (A) shall not be used—

(i) where it is established that there is no comparable land from which the average annual gross cash rental may be determined and that there is no comparable land from which the average net share rental may be determined, or

(ii) where the executor elects to have the value of the farm for farming purposes determined and that there is no comparable land from which the average net share rental may be determined under paragraph (8). (Emphasis added).

*Collier on Bankruptcy* in discussing valuation states as follows:

*When the subject property is to be used and retained by the debtor, application of section 506(a) requires that the value of such property be determined in light of such use. Thus, the manner of attributing a value to the subject property should give effect to and be consistent with such use. The proposed use will, of course, depend upon the circumstances, but will generally be a use for which the property is intended or designed (and for which it was originally acquired by the debtor).*

*Generally, if the continued use by the debtor of the subject property is contemplated, the principal purpose of the valuation will be to define the extent of the protection or benefits to be afforded the holder of a claim secured by the property to protect or compensate such holder for depriving it from immediate access to the property to recover on its claim.* This is true regardless of whether the valuation is conducted in the context of adequate protection, determining the amount of a claim for inclusion in a plan or determining a redemption price.

Therefore, in order to give effect to the purpose of the valuation as required by section 506(a), the court must determine the value of the subject property in a manner and upon a basis consistent with the protection or compensation to be afforded. To illustrate, if the valuation is to be made in a chapter 11 case in the context of providing adequate protection with respect to a decrease in the value of the subject property resulting from its continued retention and use by the debtor, and if the court finds that the prospects of successful reorganization are good, the court may find that the appropriate value under the circumstances is the value of such property to the debtor assuming uninterrupted continuation of such retention and use. Such a value of the subject property might be characterized as its replacement value to the debtor, its going concern value or, if a successful reorganization appears clearly assured, a value which takes into consider-

ation not only the tangible value of the property but also the earnings to be derived therefrom. On the other hand, if prospects for a successful reorganization appear dim, the value may more appropriately be determined on the basis of the value the holder of the secured claim could obtain for the property upon a disposition after the debtor's retention and use has ended. Similar considerations should enter into a valuation for purposes of determining the amount of a secured claim for inclusion in a chapter 11 or 13 plan, although at that point the prospects for continued uninterrupted retention and use of the property will generally be more assured. In the redemption context, however, the prospects for continued retention and use should not bear directly on the valuation because the creditor's interest in the property will terminate upon redemption (although such ´prospects might be considered in determining the value of the property to the debtor).

3 *Collier on Bankruptcy,* ¶ 506.04 (pp. 526–27–28) (L. King 15th ed.) (Footnotes omitted) (Emphasis added).

One commentator had these observations on the valuation process:

### I. Valuing Assets

#### A. *General Principles*

##### 1. "Going Concern" and "Liquidation" Values

The value of an asset is not fixed by any one proceeding in a bankruptcy case. Value may vary from proceeding to proceeding, depending upon the context. Congress explicitly recognized the need for different asset valuations in the many different proceedings which value collateral to determine the size of a secured claim. The creditor looking to foreclose on an asset used as collateral may foresee its immediate disposition and, consequently, may attach a "liquidation value" to the asset. The same creditor, seeking to maximize his secured claim under a plan of reorganization, may foresee the same asset's continued use as part of the debtor's business, and

consequently may attach a "going concern value" to the asset.

The choice between "liquidation values" and "going conern values" lies at the heart of most disputes over asset valuation in bankruptcy. The terms are so ubiquitous that a prefatory explication of each is essential. The distinction between them often illustrates the function of time in the determination of value.

A "going concern" is business with some sort of future. Assets of a going concern may be valued based on their present or projected use and their current or future contribution to the production of revenues and profits. Assets of a type normally sold by a going concern may be valued based on their prospective sale, pursuant to the concern's plans or practices, at prices that include the concern's anticipated mark-up or gross margin. Inventory is usually worth more when sold by a continuing business than when sold by a liquidator. A greater percentage of accounts receivable will ordinarily be collected by a going concern than by one in liquidation. Plant and equipment can be valued as integral parts of a revenue-producing enterprise. In short, going concern values assume events going forward. Sometimes values based on this assumption must be discounted for risk and the time value of money.

If an asset is not used as part of a business, or if the business is not viable, the asset is valued at how much it will bring at a sale less the costs of disposition—a "liquidation value." Liquidation values assume no future or a limited future for an asset's relationship to a concern. The liquidation value of an asset will depend on how much time is available for its disposition, who is selling it, and how and where it is sold.

Going concern values generally exceed liquidation values....

*Just as a going concern value is not necessarily a high value, so liquidation value is not necessarily a low value.* Although the phrase "liquidation value" is often used to mean the value of an asset in a piecemeal forced sale, this may not be a fair liquidation value. An asset may be sold at public auction or private sale, in haste or at lesiure. Some of these sales produce higher liquidation values than others. The Uniform Commercial Code, for example, requires disposition in a "commercially reasonable" manner. Even if a foreclosure sale is conducted properly, a court may reject the price realized at the sale as too low to be a true liquidation value. If the asset sold is a publicly traded security or a controlling share of a continuing business, the liquidation values realized at such sales may be indistinguishable from the going concern values of such assets.

Most courts nevertheless cleave to the dichotomy between liquidation and going concern values because the dichotomy expresses a statistical truth: Most asset "liquidations" yield less than the value of the asset if retained by its current owner.

Fortgang and Mayer, *Valuation in Bankruptcy*, 32 U.C.L.A.L.Rev., No. 6, 1061, 1063–1065 (1985). (Footnotes omitted) (Emphasis added).

Another commentator however asserts that both Collier and Fortgang and Meyer are erroneous in their analysis. He states as follows:

Collier does not recognize the basic distinction between the value of property constituting collateral and the value of the secured creditor's interest in that property. This interest consists of the right to foreclose and the obligation to employ commercially reasonable methods in so doing. That the debtor is an operating business, even one with excellent changes for a successful reorganization, may make it less likely that foreclosure will take place, but it has relatively little to do with valuation of the secured party's rights in the collateral. Other writers have also ignored this distinction. (Citing the Fortgang and Meyer article, *supra* ).

Frank F. Queenan, Jr., *Standards for Valuation of Security Interest in Chapter 11*, 92 Commercial Law Journal 18, 36, Spring, 1987.

The same commentator concluded as follows:

[W]hether in the cram down context or any other context, there is seldom reason to apply a standard of forced sale value, even in the valuation of real estate mortgages. The principle of commercial reasonableness, and not archaic state foreclosure laws, should govern the valuation of real estate mortgages as well as security interests in personal property. A standard of valuation for all such interests based upon the most commercially reasonable disposition is a sensible variation from the principle of commercial reasonableness under the Uniform Commercial Code, because under Chapter 11 we are concerned with valuing the rights of a secured creditor rather than imposing sanctions for the breach of his obligations.

*Id.* at p. 63.

Thus, it is clear that if the standard is the intended *use* the Debtor may make of the subject property this may not be the same value as the value of the secured creditors' *interest* in liquidating that very same property, and thus the Court is forced to deal with these conflicting and competing goals of use and liquidation in affixing a value.

The court has analyzed the respective appraisals of each of the parties. ·The Court reorganizes that the valuation of property is not an exact science and that where differences of opinion exist, they are largely attributable to differences of professional opinion. *In re Mikole Developers, Inc.*, 14 B.R. 524, 526 (Bankr.E.D.Pa. 1981). These individuals, experienced in analyzing properties, offer their educated opinions as guidance for the court which need not be bound by them. *In re Jug End in the Berkshires, Inc.*, 46 B.R. 892, 980 (Bankr.D.Mass.1985). The appraisals of Equitable, as to parcels sold in 1987 only in Porter County where the subject real estate is located, and Jasper County, the County directly south of Porter County, revealed the following comparables, based upon a fair market value analysis, actually sold for the following amounts (tillable acres only):

| County | Sale | Date of Sale | Price Based on Tillable Acres | No. Tillable Acres | Bu. Yield Per Acre |
|--------|------|---------|----------|---------|---------|
| Porter | 1 | 1/87 | $ 1,041. | 58 tillable | 120–140 |
| Porter | 2 | 2/87 | $ 1,039. | 41 tillable | 130 |
| Porter | 3 | 3/87 | $ 1,128. | 39 tillable | 110–120 |
| Porter | 4 | 3/87 | $ 900. | 40 tillable | unknown |
| Jasper | 9 | 2/87 | $ 864. | 58 tillable | under 100 |
| Jasper | 10 | 2/87 | $ 864. | 222 tillable | 140 |
| Jasper | 11 | 3/87 | $ 869. | 256 tillable | unknown |

It is clear that in 1987 tillable farm land in Jasper County, the county just south of Porter County, is selling for less than comparable tillable farm land in Porter County. It is also clear that the fair market price per tillable acre in Jasper County more clearly coincides with a valuation done on the income approach. The value of tillable acreage based on net income of $64.65 an acre with a .075% capitalization rate is $862.00 an acre. The Court used a .075% capitalization rate as a "blended" rate based on the testimony of Orr who stated the expected range of return to one who intended to farm the land was 5 to 7% while the expected range of return to an investor would be 8 to 10%. The value of a tillable acreage based on a net rental income of $63.00 ($75.00 gross lease less $12.00 per acre expense) based on a .075% capitalization rate is $840.00 an acre. The average fair market price of the three comparables sold in Jasper County in 1987 is $865.57 per tillable acre while the average fair market price of the four comparables sold in Porter County is $1,027.00 per tillable acre, or a differance of $161.43 per tillable acre. (In none of these comparables were there any improvements of any significance which added a contributory value to the overall value of the land) It thus appears that, assuming somewhat comparable productivity per acre for all comparable sales as to tillable acres only, the fair market value of agricultural property in Porter County is influenced by factors other than present economic return as a farm operation, i.e. a "suburban influence", or the supply and demand factors of gentlemen or hobby farmers or land speculators. As a consequence, the going-concern value to the debtor in using the farm land as such is less than the "liquidation"

value to Equitable as a secured creditor, who, assuming it would use commercially reasonable methods to dispose of the property on foreclosure may be able to sell the same on the open market to a buyer who might attach greater value to it for reasons other than those based on its value in producing farm income.

■ The court does believe that in most instances the fair market value approach is ultimately the most accurate approach in ascertaining value on "cramdown" as to most types of real estate. However, the values revealed by that approach should certainly be tested by the income approach when the debtor, as here, is attempting to reorganize rather than liquidate, in order to insure that the sale value is not unduely influenced by market factors that have no bearing on the value of the land as actually used by the Debtor. The income approach, of course, must be cautiously applied as it is fraught with many traps and pitfalls if the assumptions as to either income or the capitalization rate are faulty, for a slight change in the assumptions can greatly vary the value.

The disparity between the fair market values affixed by Equitable's appraiser ($978.84 per acre), and the Debtor's appraiser ($700.00 per acre), leads the court to the conclusion that the cram-down value lies somewhere between these two figures, giving consideration to the competing interests of both the Debtor and Equitable.

When these market value figures are tested by the income approach it is apparent that the fair market value of this real estate as *farm land* rather than for non-farm investment purposes has a reorganizational value roughly equivalent to the fair market value of tillable farm land in Jasper County rather than the fair market value that the subject property may bring in Porter County. Jasper County is a more rural, agrarian community, and it appears that fair market values for farm land there more accurately correlate to their value when actually used as farm land rather than for other purposes that might attract and influence a purchaser in Porter County. As can be seen by the figures above,

the average price per tillable acre in Jasper County as to the 1987 comparables is $865.57 an acre, while the value of the subject property on an income approach using a .075% capitalization rate and a net rental income of $63.00 an acre is $840.00 or $862.00 an acre using a net operating income figure of $64.50 an acre.

■ Accordingly, after testing the fair market value approach by the income approach the court finds that the fair market value of the property is $865.00 a tillable acre, or the average of the fair market values for the 1987 comparables in Jasper County as to tillable acres, as this more accurately reflects the true market value of the subject real estate as part of an on-going farm operation.

Assuming 561 tillable and unimproved acres, this would come to $485,265.00. Adding thereto $300.00 an acre for the 45 nontillable acres or $13,500.00, and $22,500.00 for the contributory value of the improvements, the court hereby finds that the total fair market value of these 606 acres is $521,265.00 or an overall average of $860.17 an acre. (The contributory value of the improvements is included in the determination in this fair market value approach as the comparables used by the court had no improvements of a contributory value while the subject property does). This value attempts to satisfy to some extent, the competing interests of the Debtor and Equitable, i.e. the property is assigned a fair market value when used as farm land as tested by the income approach based on a conservative capitalization rate consistent with todays farm economy, and at the same time it reflects what Equitable could reasonably expect to receive for this same farmland upon disposition thereof in the open market as farm land, and not based on what it might expect to receive from a speculator or non-farmer investor. The value is based on the actual use of the property rather than the "highest or best" use which might be for other than agricultural purposes. Although it is noted that the appraisal by Orr indicates that the highest and best use of this property is for use as a farm, and that while there are

rural residential acres in the immediate vicinity of the farm, there is little potential for sub-division of the land to enhance its value, the fact that this land does not presently have a highest and best use other than farming does not mean that there are not non-agricultural factors at work in the market which are having an influence on the value of the subject property which has made it more valuable in the market place.

Finally, it should be noted that the purpose of Chapter 12 as to permit the continuation of the Debtor's farm operation and maintain the going-concern value of the Debtor's farm assets. Liquidation value and going-concern value are often carelessly applied with the assumption that the value of the Debtor's assets are worth more as a going concern than in liquidation. This is not necessarily the case, and it is apparent that the going concern value of a farm operation can be less than the liquidation value thereof, and by liquidation value the Court does not mean an "under the hammer" forced-auction sale, but an orderly, commercially reasonable sale.

Accordingly, inasmuch as the Debtor's plan has valued said real estate at $700.00 an acre, the Debtor's plan as proposed cannot be confirmed and its confirmation is denied.

Before concluding this opinion, after going through this most difficult task of attempting to place a value on this real estate, the court would like to quote District Court Judge Winner regarding the determination of the value of property by that court. He stated:

> With all of these things, to say that you can forecast—that you can appraise the values in the Canadian Artic is to say that you can attend the County Fair with your crystal ball, because that is absolutely the only possible way you can come up with a result, and I question that any result that I come up with in the Canadian Artic is but little more than what I hope is an informed guess.

\* \* \* \* \* \*

My final conclusion ... is that it is worth somewhere between $90 million and $100 million as a going concern, and to satisfy the people who want precision on the value, I fix the exact value of the company at the average of those, $96,-856,850, which of course is a total absurdity that anybody could fix a value with that degree of precision, but for the lawyers who want me to make that fool estimate, I have just made it.

The Tenth Circuit affirmed.[1]

The Court has denied confirmation of the Debtor's plan. The court cannot rewrite the Debtor's plan. Accordingly, the Debtor is hereby granted thirty (30) days from the date of the entry of this Order to Amend his plan and failing or refusing to do so, the court may dismiss or convert this case without further notice and hearing.

The Court further finds that the fair rental value of the subject property on an annual basis is $35,343.00 based on 561 tillable acres times a net rental value of $63.00 an acre for the purposes of adequate protection pursuant to § 1205, and that Equitable is under secured. Equitable and the Debtor are therefore to confer on an appropriate adequate protection payment schedule by the Debtor based on that figure pending confirmation of Debtor's plan, and failing to agree on an adequate protection payment, either party may move the Court for a hearing to establish the same.

SO ORDERED.

---

1. *Citibank v. Baer*, 651 F.2d 1341, 1347 (10th Cir.1980) (quoting Judge Winner).