**NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORP., and United States of America, Dept. of Agriculture, Appellants,**

v.

**WABASH VALLEY POWER ASSN., INC., Appellee.**

**In re WABASH VALLEY POWER ASSN., INC., Debtor.**

No. IP 87–1127–C.

Bankruptcy No. IP 85–2238 RA(V).

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 19, 1990.

John J. List, Nat. Rural Utilities Co-op., Washington, D.C., Alan W. Kornberg, Wilbur F. Foster, Jr., Robert P. Orain, Milbank, Tweed, Hadley & McCloy, New York, N.Y., for appellant Nat. Rural Utilities.

George Kielman, Timothy Brown, Trial Attys., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for appellant U.S.

David H. Kleiman, Melvin Daniel, Dann Pecar Newman Talesnick & Kleiman, Indianapolis, Ind., for appellee Wabash Valley.

## ORDER ON MERITS OF APPEAL

McKINNEY, District Judge.

This bankruptcy appeal comes before the Court for a decision on the merits. The issues raised were fully briefed as of October 20, 1988. On December 4, 1989, this Court denied the debtor's motion to dismiss the government's appeal. Oral argument on the merits of the appeal was then heard on December 19, 1989. The Court, having reviewed the entire record and the relevant law, now enters its ruling on the appeal. For the reasons set forth below, the Court REVERSES and REMANDS this cause to the bankruptcy court for further proceedings consistent with this decision.

### I. Introduction:

One bankruptcy expert has stated that the basic purpose of Chapter 11 is that a plan of reorganization can be more readily confirmed "without the lengthy valuation hearings that were required under former Chapter X...." W. Norton, 3 *Bankruptcy Law and Practice* § 49.04 (1986). As the record attests in this case, however, where hundreds of millions of dollars are at stake and the entity seeking protection is a regulated, not-for-profit electrical cooperative, such lengthy valuation hearings may well be unavoidable. In this case, because the record below consists of thousands of pages of transcript and numerous lengthy exhibits, and in light of the number

of issues raised in this appeal, a somewhat lengthy review of the evidence and the law is required. To that end, this opinion will first set forth the basic factual history of Wabash Valley and the electrical utility industry. The Court will then review the evidence heard at the valuation hearing in this case and summarize the decision rendered by the bankruptcy court.

Then, after setting forth the applicable standards of review, the Court will address the issues raised. The central thrust of today's decision is that although the bankruptcy court was thorough in its valuation and made appropriate findings in some respects, the bankruptcy court nonetheless made several significant errors that require reversal and remand. Specifically, the bankruptcy court did not properly apply the willing buyer-willing seller standard, it did not take into consideration several crucial factors such as the enforceability of the power supply contracts or the possibility of rate increases, and it wholly failed to consider the government's mid-level valuation (Case A–1) of Wabash Valley.

II. Factual and Procedural Background:

A. *Historical Background:* [1]

Wabash Valley Power Association is a not-for-profit generation and transmission ("G & T") electric cooperative formed in 1963. It is a unique entity in that it is owned and governed by its customers, the 24 rural electric membership cooperatives ("REMCs") that buy and distribute Wabash electricity to some 175,000 retail customers in northern Indiana and southwestern Michigan. There are no true stockholders as in a traditional corporation. Each member REMC selects a director to serve on Wabash's board of directors. The Wabash board then hires its general manager who runs the day-to-day operations of the utility. Like Wabash, each REMC is owned in turn by its customers, the retail buyers of

REMC power who have paid a small fee to be a "member" of the REMC. Each REMC is also a not-for-profit entity.

At the time of formation, Wabash acted more as a clearinghouse for ideas and discussion than as a formal utility. The sole source of income for Wabash was the dues paid by its members. When the cost of electricity began to increase in the late 1960s, Wabash hired its first general manager. Through 1976, when Wabash hired Edward Martin, its present general manager, Wabash was still not supplying electricity to any of its members, and its capitalization was only $100,000.

Since that time, Wabash has grown into a full-fledged G & T with substantial tangible and intangible assets. It has a large multi-million dollar headquarters building, an ownership interest in part of the Gibson 5 generating plant, and an ownership interest in certain PSI transmission lines and substations. Wabash also has interchange and interconnection agreements with PSI, NIPSCO, CIPS, and Big Rivers Electric Cooperative in Kentucky, and has long term power supply contracts with CIPS and HE.

Wabash also has wholesale power supply contracts with all 24 of its REMC members requiring the REMCs to buy all of their power from Wabash. Each such power supply contract was entered into in 1977 as part of the planning for Wabash's investment in the Marble Hill nuclear power plant. The contracts provide that the member REMCs shall buy all their electricity from Wabash for 40 years. The revenues derived from sales of power under these all-requirements contracts constitute the primary source of revenue for Wabash. In 1984, most of the REMCs reaffirmed by way of a formal written resolution that they would perform their obligations under the power supply contracts.[2]

---

**1.** The facts highlighted in this section are generally accepted by the parties as undisputed in this case, and are taken from the evidence presented at the hearing. A complete recitation of these historical facts is found in the bankruptcy court's decision. *See In re Wabash Valley Power Assoc., Inc.,* 77 B.R. 991, 992–1000 (Bankr.S.D. Ind.1987).

**2.** Board Resolutions affirming the contracts were introduced from 18 of the 24 REMCs; the record suggests that five of the other six REMCs might also have affirmed the contracts as requested by REA, and that one REMC did not affirm its contract. The record, however, is not clear as to these six REMCs.

Wabash and its member REMCs are subject to extensive regulation by the State of Indiana. Each REMC has a legislative monopoly over an exclusive geographical area. The rates charged by Wabash and the REMCs are governed by the Utility Regulatory Commission, formerly known as the Indiana Public Service Commission.

Before Wabash began supplying its members with power, they received their electricity directly from one of four investor-owned utilities ("IOUs"): NIPSCO, IP & L, PSI, or I & M. Each REMC generally bought power from the nearest IOU. When Wabash entered the picture, it purchased most of its power from the same four IOUs and charged its REMCs a "melded" or average rate of all the rates Wabash paid to its suppliers. Half of the power was purchased from PSI, 25% from NIPSCO, 25% from I & M, and less than 1% came from IP & L.

At some point NIPSCO's rates began to rise dramatically causing Wabash's melded rate to rise for all its REMCs. The increase led to unrest among some REMCs outside the NIPSCO area because of the melded rate structure under which 25% of the higher NIPSCO rate was paid by all REMCs. As a result of customer pressure, the Wabash Board sought and eventually obtained a change in its rate structure. The new structure uses a "50/50" system under which each REMC's rate is 50% of the melded rate and 50% of the rate charged by the IOU that formerly served that REMC. As a result, the rates charged to Wabash's members vary considerably, with rates in the NIPSCO area exceeding those charged in other areas by more than 50%.

Even after adoption of the 50/50 rate, Wabash's rates continued to rise, due in part to increases in NIPSCO's rates. Wabash tried but failed to obtain another rate change and an alternative source of electricity in the NIPSCO area. Wabash then filed an antitrust action against NIPSCO. That lawsuit was settled in 1983, and Wabash was allowed to decrease its purchases from NIPSCO and "wheel" power over NIPSCO's lines from other suppliers.

In the mid–1970s, PSI approached Wabash concerning the possibility of Wabash participating as an investor in the Marble Hill project. Wabash eventually agreed to be a 17% investor. The Rural Electrification Administration ("REA"), a federal agency created to promote the availability of electrical power in rural America, agreed to guarantee a loan made by the Federal Financing Bank. Such loans are priced at relatively low interest rates, and a borrower can use such a loan to finance 100% of the costs of constructing new facilities. In February of 1978, REA agreed to guarantee a loan to Wabash of not more than some $360,000,000, for Wabash's participation in Marble Hill.

In April of 1980, Wabash and the REA supplemented the original mortgage and security agreement to add the National Rural Utilities Cooperative Finance Cooperative ("CFC") as a secured party. This was done because CFC had guaranteed payment of $2,750,000 in revenue bonds for Wabash to build its headquarters in Indianapolis. CFC is a not-for-profit association that provides its rural electrical cooperatives with funding to supplement REA's loan program.

While work continued on Marble Hill, Wabash borrowed additional funds guaranteed by the REA such that its total REA indebtedness reached $673,000,000. Some of these funds were used to purchase an interest in 29 PSI substations and 10 PSI transmission lines. Another portion of the funds was used to implement Wabash's load management program.

In August of 1982, Wabash borrowed an additional $133,000,000 in REA-guaranteed funds and purchased a 25% interest in PSI's Gibson 5 coal-fired generating plant. Then, in December of 1982, Wabash issued a new secured promissory note to CFC for the guarantee of $24,000,000 in pollution control revenue bonds used to pay for pollution control devices at Gibson 5.

The Marble Hill project ran into difficulties and construction was officially discontinued in January of 1984. At that point, Wabash had borrowed and invested $486,-000,000 in Marble Hill; all of its non-Mar-

ble Hill debt totaled $150,000,000. In April of 1984, at the insistence of the REA, Wabash filed for a 51% rate increase to pay for its Marble Hill debt. Publicly, however, Wabash stated that it actually opposed the requested rate increase. This "Rate Case" languished for some time.

In the interim, the Indiana Court of Appeals and Indiana Supreme Court ruled that NIPSCO, an investor-owned utility, could not raise its rates to recover the sunk costs of a cancelled nuclear power plant known as Bailly N–1. *See Citizens Action Coalition v. NIPSCO*, 485 N.E.2d 610 (Ind. 1985) *aff'g*, 472 N.E.2d 938 (Ind.App.1984). As a result, in January of 1987, the Utility Commissioner dismissed Wabash's rate request reasoning that the principles upon which the *NIPSCO* case were decided were equally applicable to an entity such as Wabash whose rates are governed pursuant to *Ind.Code* § 8–1–13–1 et seq.

The Utility Commissioner noted, however, that a "paradox" existed with the *NIPSCO* case in that the Indiana Supreme Court there held that a utility's *ratepayers* are not responsible for costs associated with property that is not used and useful in furnishing service. *See* Wabash Exhibit 10 (emphasis in original). The Commissioner noted that, unlike the *NIPSCO* case involving an IOU, Wabash's ratepayers are also its owners. The Commissioner also indicated that the 51% rate request was based solely on Marble Hill debt, and in its order dismissing the Rate Case the Commissioner invited Wabash to seek a rate increase on some appropriate basis not related to its Marble Hill investment. Wabash did not file such a petition.

The REA and CFC thereafter appealed the Utility Commissioner's decision, but Wabash did not. The decision was affirmed by the Indiana Court of Appeals after the date of the bankruptcy court's valuation, *National Rural Utilities Cooperative Finance Corp. v. Public Service Commission*, 528 N.E.2d 95 (Ind.App. 1988), and the matter is now before the Indiana Supreme Court.

B. *The Proceedings Below:*

Wabash first defaulted on its payments due on its Marble Hill debt in September of 1984. In May of 1985, Wabash filed its Chapter 11 petition. Wabash eventually filed an application for valuation asking the bankruptcy court to determine the going concern value of Wabash for purposes of §§ 506(a), 1111(b), and 1129 of the Bankruptcy Code. The bankruptcy court held hearings for six weeks at which Wabash and the REA presented their evidence. This portion of the opinion summarizes the most relevant evidence adduced at trial. Additional and more specific references to the record will be made during the analysis of individual issues later in the opinion.

1. Wabash's Case–In–Chief:

Wabash called six witnesses and offered 56 different exhibits in its case-in-chief. Edward Martin, Wabash's general manager, testified as to the general history and structure of Wabash and the nature of the utility business.

a. *Edward Martin's Testimony:*

Martin stated that the short-term power market is competitive because of an excess capacity among midwestern utilties. He discussed the pervasive control that the REA has over Wabash because of the amount of debt Wabash owes the REA. Concerning the member REMCs, he stated that they signed the power supply contracts because the REMCs wanted to gain some control over their supply arrangements. He noted that rates are still an area of great discontent among its REMCs.

Martin admitted that Wabash has not made an in depth study of the long term aspects of price elasticity. Propane gas would be available to all residential customers of the REMCs, he noted, but natural gas would not be, although he stated that "a large part" of the customer base would be able to obtain natural gas. He stated that if the wholesale power prices charged to REMCs became "excessively higher," some members would attempt to make a change to a lower priced supply. He also admitted on cross-examination that if NIPSCO area members were charged the NIP-

SCO rate, they would pay more than the current rates under the 50/50 structure. According to Martin, 5% of Wabash's ultimate users are commercial accounts (business, industry, etc.). These commercial customers account for 20% of Wabash's total consumption.

Martin explained that "wheeling" is the payment of rent for the use of another utility's transmission system for the transmission of power. He analogized wheeling to the operation of a toll road where a fee is paid for use of the system. In order to wheel over another utility's lines, Martin stated that the party seeking to wheel must have a contract with the owner of those lines. Martin noted that Wabash's REMCs do not have such wheeling contracts with NIPSCO.

Martin added that NIPSCO wheels for other entities and that NIPSCO "should have a wheeling rate on file" with the Federal Energy Regulatory Commission ("FERC"), which has jurisdiction over wheeling. He later noted that in order to wheel, the REMCs would have to have a tariff or a contract. He admitted again that the REMCs do not have the wheeling contracts with NIPSCO, but said "NIPSCO must have a tariff." Martin explained that the tariff is the group of papers filed with the FERC setting forth what the company will do concerning wheeling. When asked whether he knew if NIPSCO has a tariff on file, Martin replied that "NIPSCO must have a tariff. Whether it's filed or not, it has a tariff." Upon further questioning he stated that he "think[s]" NIPSCO has a contract or tariff on file for wheeling to Wabash Valley, but admitted that he does not know whether there is such a tariff for the municipal systems.

Regarding rates, Martin stated that some of the REMCs are charged rates 50% higher than other members. The REMCs paying the higher rates have been able to collect sufficient revenues to cover their costs. As to the Rate Case, Martin admitted that Wabash never told the Public Service Commission that it did not support its own rate request, although it did tell the public that it opposed its own rate increase request. In the public "Rate Increase Announcement" issued by Wabash concerning its opposition to its own Rate Case, Martin stated that Wabash was seeking to extend the repayment of the Marble Hill debt over 35 years. Such a phase-in of rates, Martin noted, would cut the average 35% rate increase to just 10%. Martin called a 10% jump in rates "an increase our people can live with if rates must go up next year."

b. *Dr. George Stolnitz' Testimony:*

Wabash next called Dr. George Stolnitz, an economics professor from Indiana University. Stolnitz was qualified by the lower court as an expert in the field of economics. His basic purpose in assisting the Wabash team of valuation experts was to provide expertise on inflation and interest rates. He viewed 4% as the most probable inflation rate.

As to discount rates, he testified that the discount rate used in any scenario is heavily influenced by prevailing interest rates. Risk is also a factor in selecting discount rates. Stolnitz explained that the greater the risk in the investment, the greater is the required return. He selected a base, risk-free discount rate of 7%, and added 2%–4% to that base rate for investing in Wabash due to risk.

Stolnitz commented on the unique factors that impact a valuation of Wabash Valley. He noted the regulatory aspect of the business and the unique ownership structure of the cooperative. He stated that he was aware of the power supply contracts, "not as a legal eagle on this but as an economist," and noted that they should be taken into account. He went on to add that "it's also true that there are alternative suppliers, there are alternative ways out if for some reason Wabash Valley does not satisfy the immediate customer in this case, the REMCs; just as in competitive markets, if you don't like Ford you can think of Chevrolet and so on." He noted that there "are differences, of course, but there are analogies of importance."

On cross-examination Stolnitz stated that the value of Wabash is equivalent to the present value of the future earnings that Wabash can earn. He noted that a buyer

of Wabash would try to analyze whether the company could raise rates, and would consider the risk that REMCs might try to buy elsewhere. He admitted that whether or not the REMCs could break their power supply contracts is a legal question, and that a prudent buyer might and should seek legal advice on the issue. He also admitted that all of Wabash's experts were told to assume that the legal obligations having to do with Marble Hill were not to be considered in their calculations.

He finally identified two risks that are unique to Wabash Valley: the risk of the contracts being broken and the risk that revenues would go down when rates increased. He admitted that the risk that REMCs might be able to obtain power elsewhere was an economic factor to the extent that power might be cheaper somewhere else, and was a legal issue concerning the enforceability of the power contracts. He stated that the risks of revenues falling if rates were increased depended on elasticity. He admitted that he is not aware of any elasticity studies done by Wabash Valley.

### c. *Paul Reising's Testimony:*

Wabash Valley's third witness was Paul Reising, a partner in the engineering and consulting firm of R.W. Beck and Associates. The firm specializes in utility work including long-range planning, feasibility studies, and rate analysis. Reising's firm was retained by Wabash to perform long-range power supply cost estimates for use in the valuation.

In its analysis, Reising's firm used both a base case that assumed Wabash would stay intact and a dissolution case that assumed Wabash would break up into four subgroups. The dissolution case made no assumptions as to how the subgroups would be organized, but did posit that the subgroups could get power at the same cost as when unified. The Beck experts assumed that the REMCs would be able to "pursue their own power supply arrangements or pursue power supply only their own initiative."

On further examination Reising admitted that he did not know "anything about the effects of breach of contract and so forth." The Beck experts did not consider any legal obligations that the REMCs might have for breach of contract if the power supply contracts were breached. The Beck reports also assumed that the utilities supplying power to Wabash would be just as willing to supply power to the members on the same terms. On redirect examination, Reising stated that the Beck experts figured price elasticity into their reports.

### d. *Dr. Wilbur Lewellen's Testimony:*

Wabash's fourth witness was Dr. Wilbur Lewellen, a professor of finance from Purdue University. Lewellen prepared a valuation of Wabash Valley based upon the cost savings that the REMCs realize because of Wabash's existence. He chose a 4% inflation rate, used 7.5% as a base discount rate, a beta value of .7, and a net adjusted discount rate of 13.4%. Lewellen initially valued Wabash at $211,000,000 using the 4% inflation rate, and later adjusted this upward by three to five million dollars.

### e. *S. Paul Kovich's Testimony:*

Wabash next called S. Paul Kovich, a senior vice-president with Shearson–Lehman Brothers in New York, to discuss his valuation. Kovich used a market-based evaluation method to value Wabash Valley. He approached the problem by proceeding as though Wabash were going public. He was aware of the power supply contracts with the REMCs, and stated that in a public offering setting, Wabash would be asked to go back to the REMCs and have the contracts reaffirmed or guaranteed. He noted that there are "a number of instances in the rural electric industry where these contracts are being challenged."

One of Kovich's hypotheses was that as a for-profit entity, the new Wabash would receive a rate increase to allow for some return to investors. He also believed that the rate increase would be limited by the competition that Wabash faces in the wholesale power supply market. He stated that Wabash would not be able to raise its rates above those charged by neighboring IOUs.

Kovich then estimated the average net income that Wabash would generate and applied a range of price/earnings valuations to derive a range of valuations. He ultimately valued Wabash at $203,756,000 using a 4% inflation rate.

On cross-examination, Kovich admitted that if regulatory authorities allowed Wabash to recover any portion of its Marble Hill debt through rate increases, those amounts recovered would have to be added to the going concern value of Wabash. Kovich admitted that his valuation included a 100% risk that the power supply contracts would be broken by the REMCs if rates were raised significantly. He admitted that he did not obtain a legal opinion on whether the contracts could be broken, and stated that he would not make a public offering without getting such an opinion. Kovich discussed a bond offering in Washington that involved similar contracts. In that case, the Washington Supreme Court ruled that the utilities in question did not have the authority to enter into the contracts.

### f. *Robert Gross' Testimony:*

Wabash Valley's final witness in its case-in-chief was Robert Gross, who works for American Appraisal Associates, Inc., the world's largest valuation firm. Gross valued Wabash by using the income approach to valuation. He defined the going concern value of Wabash as the price that would be reached by "a willing buyer and a willing seller, each having reasonable knowledge of all relevant facts, neither being under compulsion, and equity to both." Gross assumed that rates could not be raised beyond those charged by neighboring IOUs, and thus specifically chose the pricing ceilings proposed in Beck's dissolution case. His earnings estimates also came from the Beck figures in the dissolution case.

Gross viewed Wabash as only slightly more risky than the median investment, and thus used an adjusted discount rate ranging from 9.4% to 9.8%. His values for Wabash ranged from $190,000,000 to $243,-000,000 using 4% inflation.

On cross-examination, Gross admitted that if the rates charged by NIPSCO were used in projecting revenues for Wabash, the revenue streams and corresponding values would have been higher. He stated that he made no independent analysis of rate sensitivity of the REMCs. He admitted that he assumed the REMCs would be able to avoid their power supply contracts with Wabash, and if that assumption were changed, the result would be "very different." He also admitted that if the contracts were enforceable, if "higher rates" were approved, and if those rates could be paid by members, the amount of his valuation would go up.

On re-direct, Gross stated that he would not make an appraisal based on those assumptions because of the *NIPSCO* case, because a rate increase necessary to pay for Marble Hill would be of "such magnitude that it would just blow the revenues right out the ceiling ...," and because in his own non-legal opinion, "there is a significant doubt in my mind as to whether [the power supply contracts] would be enforceable."

### 2. The REA's Case–In–Chief:
#### a. *Martin Seipel*

The government called Martin Seipel, an REA employee, as its first witness. He formerly served as the REA regional director of the Northeast Area, which included Indiana, and is now the director of the Southwest area. He described the use of all-requirements contracts in the utility industry. Seipel stated that they are important in that they assure lenders that there is a source of revenue to cover the loan; this is particularly true in the case of G & Ts, which have only 4% equity, as compared to IOUs that typically have 40% equity. The security for REA guaranteed loans is a lien on the all-requirements contracts. These, Seipel testified, are the real source of revenue. The REA has approximately 775 utility borrowers that use all-requirements power contracts to secure their loans. In Wabash Valley's case, the REA required such contracts as security for the Marble Hill loans.

On cross-examination, Seipel stated that he was aware of instances in which utilities have tried to avoid their obligations under their all-requirements contracts. On re-direct, he discussed two such cases, *Shoshone River* and *Coosa Valley*. He noted that the *Shoshone River* case was in litigation, and that in the *Coosa Valley* case the enforceability of the all-requirements contracts was upheld in court.

### b. *Howard Stone's Testimony:*

The government's next witness was Howard Stone, an employee of Pfeffer, Lindsay, & Associates, a national electrical utility consulting firm. The bankruptcy court qualified Stone as an expert. His firm did a load forecast and revenue requirements model of Wabash for the REA in 1985. Stone discussed the short and long run effects of price elasticity. In his firm's report, he used low pressure propane gas as the substitute to show the cross price effect of rate increases for residential customers, and natural gas was used for non-residential buyers.

He found the price elasticity of demand to be (-.018), that is, for a 1% increase in price, average use would decline .018%. This short run figure was based on historical data. Long run elasticity was not directly included in the model, but Stone testified that it was reflected in the coefficient of lag used. Stone computed elasticity for Wabash to be (-.1) for 1986 and (-1.66) for the year 2000.

Stone and his associates analyzed two different scenarios. The first, Case A–1, assumed 4% inflation, 4% annual rate increases, and a discount rate equal to the favorable interest rate charged by the FFB (7.434%). Case A–1 resulted in a value for Wabash Valley of $495,000,000. Case A–2, on the other hand, assumed a 21% rate increase in 1986, with annual increases of 4% thereafter. Case A–2 yielded a valuation of $864,000,000.

Stone noted that some increases in real income offset the negative effects of price increases, and that growth in customers also affects loads and revenues. Stone compared the REA's projected growth of residential customers to Wabash Valley's projection and found that the REA's projection was lower than Wabash's. Historical data presented by Stone showed that in general, average customer use in the Wabash service area has increased over time even though rates have increased.

Stone noted that for Wabash Valley, real rates went up 9.3% from 1981–85, while the number of customers went up slightly and the average use per customer went up about 9%. A government exhibit also showed that midwestern G & Ts have similarly experienced increases in total sales and customers despite rate increases. Stone testified that if Wabash raised its rates 17%, retail rates would go up 12% and Wabash customers would still be charged less than NIPSCO customers. Stone noted that there are currently 12 Wabash REMCs in the NIPSCO area.

### c. *William Lindsay's Testimony:*

William Lindsay, a principal of Pfeffer, Lindsay, & Associates, testified concerning his firm's valuation of Wabash Valley. Lindsay has a masters degree and a Ph.D. in economics. He worked for the FERC for many years and considers himself a rate and regulation specialist. He stated that he has reviewed load forecasts and valuations in his work, but had never done one himself prior to Wabash Valley. The bankruptcy court accepted Lindsay as an expert.

In his valuation, Lindsay assumed that Wabash could raise and collect rates to cover its debt. He also assumed that the REMCs would honor their all-requirements contracts and continue to purchase their power from Wabash. He noted that it would be risky for the REMCs to break the contracts and go on their own. One risk he identified is that the utilities might not wheel power to them. As to whether NIPSCO has a tariff that would be available for the REMCs to wheel under, Lindsay stated, "They [NIPSCO] have no such tariff I know about that would be applicable to cooperative distributors." He added that NIPSCO has a tariff that applies to municipals only, not to all-requirements cooperatives like the REMCs.

On cross-examination, Lindsay stated that if no rate increase were effected, the $495,000,000 valuation from Case A–1 would be slightly lower. Lindsay admitted that his 7.434 discount rate is close to a risk-free rate. He confirmed that his valuation assumed that all 24 REMCs would stay intact. He also assumed that a new buyer would be able to get the all-requirements contracts assigned to it, and that the proposed rate increases would be approved.

#### d. *Ted Kuhn's Testimony:*

Ted Kuhn, an economist with Beck & Associates, testified as to work he had previously done for Wabash Valley. He had helped Wabash with load forecasts in 1980–81. In 1984, he determined Wabash's short term price elasticity to be (-.4). In 1986 he determined it to be (-.33). He testified that these figures do not appear to change at any given price levels.

#### e. *REMC Directors' Testimony:*

The government next read into evidence the deposition testimony of a director of each of the 24 member REMCs. On direct examination by the government, each of the 24 directors testified that he considered the all-requirements contracts binding and/or intended to honor them in the future. Only one director stated on direct examination that his REMC had formally discussed or considered getting out of the contract.

The direct examination of several of the directors went into additional areas. For instance, Alvin Long of Wabash County REMC testified that natural gas lines do not run to most of his customers. He stated that less than 10% of his customers could obtain natural gas at that time. In the last five years, eight of his 4,200 customers switched to gas, while the REMC picked up about 60 new customers each year. A Warren County REMC director noted that his REMC serves only four customers per mile, which is one of the lower densities among Wabash members. Warren Parish of LaGrange County REMC stated that natural gas is running "very strong" in Northern Indiana.

A director from Kosciusko County REMC stated that a "contract's a contract," while Bill Beck of Boone County REMC testified that he "sure does" consider the power contract binding. Joe Clem of Warren County REMC stated his view of the contracts may change if he were told they had to pay for Marble Hill, while Gordon Sams of Steuben County REMC noted that if rates were increased to pay for Marble Hill his cooperative would try to break its contract.

A Parke County REMC director noted that his REMC's rate forecast shows that previously projected rates are higher than what is now being charged. Parke County had expected a 50% increase due to Marble Hill. Calvin Loy of Jay County REMC testified that Wabash cannot wheel into the I & M service area.

Wabash Valley later introduced additional portions of the director depositions. Several of the directors spoke about the depressed farm economy in rural Indiana and noted that uncollectibles had risen. Bill Beck of Boone County REMC noted that his board gets yelled at by customers for every rate increase. Dale Fisher of Whitley County REMC estimated that 25% to 50% of his customers could get natural gas for space heating. No director testified that his board had determined the maximum rates that could be realistically charged, and no director testified that his board had sought a legal opinion on the enforceability of the contracts.

#### f. *Richard Setliff's Testimony:*

Richard Setliff, an employee of Wabash Valley, testified concerning his planning and forecasting duties at Wabash. He conducted a load forecast for Wabash in 1986 under the assumption that the Marble Hill debt would not be repaid. He found short run elasticity to be (-.33) for Wabash, and noted that the principal substitutes for space heating are propane gas and oil. He determined in 1984 that non-residential users are less responsive to price increases than residential users, and stated that 24% of Wabash's total end sales are to non-residential users.

On cross-examination, he noted that the majority of residential electric heat custom-

ers had installed their systems in the late 1960s and early 1970s. At that time electricity was relatively inexpensive and all-electric homes were popular. He stated that as these systems wear out and need to be replaced, many customers could shift to gas, although he did not discuss the availability of gas. He noted that 50% of Wabash's revenues come from heating and cooling, while the other 50% comes from the use of lights, appliances, etc.

### g. Linda Santucci's Testimony:

Linda Santucci, the assistant chief of operations in the REA's Northeast area, testified briefly for the government. She authenticated several utility bond issuings that involved all-requirements power contracts.

### h. Larry Bladen's Testimony:

Larry Bladen, an REA finance policy specialist, testified concerning the use of all-requirements power contracts in bond issues. He discussed a bond issue done in Alabama in which the official statement in the offering indicated that the Alabama utility had all-requirements contracts with its members. That bond offering also disclosed that one of the member cooperatives was considering a challenge to its all-requirements contract. The Alabama utility brought an action against that member and prevailed. Bladen testified that the underwriters paid 97.68% of the purchase price for the bonds.

Bladen discussed another bond issue in North Dakota where the all-requirements contracts were integral to the offering. He also noted that the town of Sullivan, Indiana, sold bonds guaranteed by the CFC that relied on wholesale power contracts as the source of security. Investors in that case were given information about the power contracts in the official statement of the offering. He later added that in his opinion, underwriters would not undertake such offerings if they perceived risks with the power contracts.

### i. Don Morton's Testimony:

The government next called Don Morton, Wabash Valley's general counsel, to the stand. Morton testified that as part of a loan form CFC to Wabash in July of 1984, Wabash had all its members attest to the enforceability of the all-requirements power contracts. On August 7, 1984, Morton sent a letter to CFC with resolutions from 16 of the members affirming the enforceability of the contracts. Morton was "not sure" whether 23 of the 24 members systems passed such resolutions, nor was he sure whether Boone County REMC was the only system that did not pass such a resolution.

A letter written by Morton to CFC on August 1, 1984, stated that Morton was enclosing such resolutions from 16 of the 24 REMCs. Morton's letter further provided that "Boone County REMC elected not to pass such a resolution," and that the "remaining resolutions [from] Carroll County, Fulton County, Fruit Belt, Jay County, Kankakee Valley, Tipmont, and Whitley County, will be forwarded to you as soon as they are received by Wabash Valley."

### j. Discovery Responses and Other Evidence:

The government next introduced various discovery items and miscellaneous documents. The government introduced the Complaint filed by the G & T in the *Shoshone River* case, as well as the jury's special verdict form finding the defendants liable for breach of contract, estoppel, tortious interference with contract, breach of fiduciary duty, and punitive damages in connection with power contracts.

Wabash admitted that NIPSCO's 1985 wholesale power rates exceeded those charged by PSI by more than 75%, and that the REMC in Wabash's system with the highest rates exceeded the lowest rates in the system by more than 50% in 1985. Wabash admitted that the REMC with the highest rates has not filed for bankruptcy, and has not abrogated nor taken any action to avoid its all-requirements contract with Wabash. Wabash further admitted that the REMCs with the second, third, fourth, and fifth highest rates also have not taken any such action.

Wabash conceded that if the REMCs raise their rates to pay for the Marble Hill

debt, those rates would still be lower than those charged by the five REMCs charging the highest rates. Wabash also admitted that if the REMCs in the NIPSCO area cancelled their power contracts with Wabash and bought from NIPSCO, their rates would increase.

### 3. Wabash Valley's Rebuttal:

#### a. *Don Morton's Testimony:*

Wabash Valley called its general counsel back to the stand on rebuttal. Morton testified that if Wabash were not in existence the member systems would have the right to wheel power over NIPSCO's lines into their delivery points. He stated that the tariff is on file with the FERC.

Concerning rates, he testified that a rate change request cannot be filed more than once every 15 months, and that the proposed rate change must be cost of service justified. He stated that only variable costs are affected by inflation, and noted that fixed costs comprise 60% of Wabash's costs.

On cross-examination, Morton testified that he is not sure if he has ever seen the entire tariff document. He indicated that those documents would be in the central files of Wabash Valley's office, and that he would not have had any trouble locating them and bringing them with him to court. Morton admitted that NIPSCO could at least make the argument that the tariff in question is not applicable to all-requirements customers.

#### b. *Dr. Shannon Pratt's Testimony:*

Wabash's final witness was Dr. Shannon Pratt, the president of a consulting and appraisal firm. Pratt has done many business valuations. He criticized Lindsay's valuation for not disclosing the impact on value if the assumptions were incorrect. Pratt stated that he would not rely on Lindsay's report because, in Pratt's opinion, Lindsay did not really give a valuation.

Pratt criticized the assumption in the REA's Case A–2 that Wabash can raise rates to pay for Marble Hill. Pratt stated that there are risks inherent in Wabash Valley, the two biggest not taken into ac-count being regulation and competition. On cross-examination, Pratt stated that an appraiser would consult legal counsel to get an opinion on whether the all-requirements contracts are voidable.

### III. The Decision Below

In a lengthy and well written opinion, the bankruptcy court selected the valuation done by Robert Gross, one of Wabash's experts, and determined Wabash Valley's going concern value to be $212,055,000. *See In re Wabash Valley Power Ass'n. Inc.,* 77 B.R. 991 (Bankr.S.D.Ind.1987). The bankruptcy court first traced the history and structure of Wabash and the industry, discussed the forecasts done by both sides, and then set forth the valuation methodology. The court noted that the valuation was being made pursuant to § 506(a) of the Code for the purpose of bifurcating secured creditors' claims into secured and unsecured claims. The court stated that it did not need to make any legal conclusion in determining going concern value, but merely had to decide "whether a willing buyer would perceive a risk that the contracts are voidable and alter its offer accordingly."

The lower court then analyzed each of the valuations offered by the parties. It first set forth Lindsay's valuations done on behalf of the government, and then critiqued Lindsay's method at great length. The court determined that, in light of the *NIPSCO* decision, a willing buyer would not assume that a rate increase could be obtained to pay for Marble Hill debt.

The lower court then wrote that even if a willing buyer were to assume that rates could be increased "as high as proposed by Lindsay in Case A–2," a willing buyer would nonetheless perceive a "significant risk that the large rate increase would result in a decline in the stream of income." The court criticized the REA's measure of elasticity because the REA did not consider propane gas as a substitute for residential customers and because the model "cannot account for any new technology which might provide another substitute for electricity purchased from Wabash...."

The bankruptcy court then stated that if the Rate Case seeking a 51% rate increase were reversed in favor of higher rates, the retail customers "might revolt." The court stated that many REMCs are "already disgruntled" with Wabash's rates, and "would likely press for relief from any large rate increase." The court added that one way to obtain relief would be to "alter the legislative monopoly granted to the REMCs." Retail customers "could agitate for simple amendment of the statute which gives an REMC its monopoly, and amendment could allow individual members to flee their REMCs for IOUs or municipal suppliers." Alternatively, the court theorized that customers could challenge the monopoly on the grounds that the REMCs were no longer providing "adequate service" as is required by Indiana statute.

The bankruptcy court further criticized the government's valuation on the grounds that the all-requirements contracts and the resolutions affirming them by the REMCs "do not accurately predict the future behavior of any of the REMC boards." The court stated that the cases cited by the REA "would not necessarily deter the member REMCs from attempting to avoid the contracts through bankruptcy or some other means."

Then, the bankruptcy court attacked the discount rate of 7.434% used by Lindsay, and finally concluded that Lindsay's valuation was "simply ... not a going concern valuation" because the primary purpose of the report seemed to have been "to prove that Wabash could raise its rates sufficiently to repay the Marble Hill debt."

The bankruptcy court then discussed the three valuations offered by Wabash Valley's experts. The court rejected Lewellen's cost-savings approach and Kovich's public offering analysis, but noted that both had merit and were close to the value ultimately chosen by the court. Concerning the tariff issue, the bankruptcy court wrote:

> On the whole, the witnesses testifying for Wabash seemed more convinced of the tariff's existence than REA's witnesses seemed convinced that the tariff

did not exist. The Court believes that the tariff either is on file, should be on file, or that the members in the NIPSCO area could wheel power over NIPSCO's lines after some legal wrangling.

The bankruptcy court then reviewed Robert Gross' valuation, and approved of Gross' assumption that the power supply contracts would be broken. The court found his valuation to be appropriate, used his 9.4% discount rate and 4% inflation rate, and selected $212,055,000 as the going concern value of Wabash. The court wrote that this represented the most that it believed a willing buyer would offer for Wabash.

Before analyzing the lower court's decision, it is first necessary to set forth the applicable standard of review in this bankruptcy appeal.

### IV. Standard of Review

In reviewing a decision of the bankruptcy court, this district court acts as an appellate tribunal and is governed by traditional standards of appellate review. Specifically, the Court is "constrained to accept the bankruptcy court's findings of fact unless they are clearly erroneous." *In re Excalibur Auto Corp.*, 859 F.2d 454, 457 n. 3 (7th Cir.1988); *In re Longardner & Associates, Inc.*, 855 F.2d 455, 459 (7th Cir. 1988). Rule 8013 of the Rules of Bankruptcy Procedure reiterates this standard, and further adds that "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *See In re Potter Material Service, Inc.*, 781 F.2d 99, 101 n. 1 (7th Cir. 1986) (court notes that Rule 8013 provides the standard of review in bankruptcy appeals).

"A finding is clearly erroneous if upon review of the entire record the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Graham v. Lennington*, 74 B.R. 963, 965 (S.D.Ind.1987). "Generally, as long as the bankruptcy judge's inferences are reasonable and supported by the evidence, they will not be disturbed." *Id.* The clearly erroneous rule is founded on both the superior position of the trial judge

to make credibility determinations, as well as notions of judicial economy achieved by having the trial on the merits serve as the "main event" rather than a "tryout on the road." *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (*quoting Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977).

■■■ On the other hand, conclusions of law made by the bankruptcy court must be reviewed *de novo. Excalibur Auto Corp.,* 859 F.2d at 457 n. 3; *Calder v. Camp Grove State Bank,* 892 F.2d 629, 631 (7th Cir.1990); *In re Rice,* 90 B.R. 386, 390 (N.D.Ind.1988). Moreover, where the challenged finding is a mixture of law and fact, the clearly erroneous standard is also inapplicable. *In re Maitlen,* 658 F.2d 466, 470 (7th Cir.1981); *Rushville Production Credit Assoc. v. Mohr,* 42 B.R. 1000, 1002 (S.D.Ind.1984); *Graham,* 74 B.R. at 965.

The decision to label an issue a "question of law" or a "question of fact" "is sometimes a matter of allocation as it is of analysis." *Chicago Truck Drivers v. Louis Zahn Drug Co.,* 890 F.2d 1405, 1410 (7th Cir.1989). Where Congress has not spoken and the issue falls "somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.*

■■■ In this case, the parties disagree somewhat on whether the valuation made by the bankruptcy court is a factual finding subject to the clearly erroneous standard, or, instead, is a mixed question of law and fact subject to *de novo* review. The case law resolves this dispute by holding that valuation entails both legal and factual de-

terminations. *See, e.g., In re Ebbler Furniture and Appliances, Inc.,* 804 F.2d 87, 89 (7th Cir.1986) (value is mixed question of fact and law); *Smith v. Associates Commercial Corp.,* 870 F.2d 1022, 1026 (5th Cir.1989) (same). The bankruptcy court's selection and application of valuation methodology is primarily a legal matter, whereas the findings made under the selected valuation standard are factual. *In re King Resources Co.,* 651 F.2d 1326, 1335 (10th Cir.1980); *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 82 (3d Cir.1975); *In re Snider Farms, Inc.,* 79 B.R. 801, 812 (Bankr.N.D.Ind.1987).

Thus, while the findings made by the bankruptcy court will not be disturbed unless clearly erroneous, the selection and application of the valuation standard must be reviewed *de novo.* As the Supreme Court has explained in a similar setting, "Evaluations of evidence reached by the accurate application of erroneous legal standards are erroneous evaluations." *Protective Committee v. Anderson,* 390 U.S. 414, 445, 88 S.Ct. 1157, 1173–74, 20 L.Ed.2d 1 (1968). *Accord, King Resources,* 651 F.2d at 1335; *Amerada Hess,* 517 F.2d at 82.

With these standards of review at hand, the issues raised can now be addressed.

## V. Discussion:

■■■ The bankruptcy court was faced with a difficult task and its decision is proper in some respects.[3] The lower court's rejection of the cost-savings approach and private offering analysis are certainly supported by the evidence. The court's selection of the 4% inflation rate and the 9.4% discount rate is also appropriate. The court properly decided that it was not to make binding legal decisions on whether the power contracts are enforceable or whether rates can be increased, but

---

3. Not surprisingly, the parties have different views of the lower court's decision. At oral argument, for instance, the government admitted that the opinion was "facially appealing," but otherwise attacked its assumptions and reasoning. Wabash, on the other hand, commented that the opinion was one of the finest ever issued in this District and had received national praise.

For the record, the lower court's opinion has been cited once in the two years since it was rendered. *See In re Anderson,* 88 B.R. 877, 884 (Bankr.N.D.Ind.1988) (citing *Wabash* bankruptcy court opinion for proposition that the proper date to determine value of collateral is the date of the hearing).

instead was to decide what risks are associated with these factors and how those risks impact valuation. And, the court properly attacked some of the assumptions made by REA's experts in their Case A–2 valuation that resulted in a figure of $864,000,000.

The lower court did, however, make both legal and factual errors that require partial reversal and remand. As a legal matter, the court failed to apply the willing buyer—willing seller method to determine going concern value as it purported to do. Instead, the court looked only at the buyer's side of the equation and ignored the countervailing seller's interests shown by the evidence. The lower court also committed reversible error as a matter of law by wholly failing to consider the government's mid-level valuation presented in Case A–1.

The bankruptcy court also erred by failing to consider the possibility that Wabash might be able to recover some of its Marble Hill debt. Moreover, as a factual matter, the court's findings that the power supply contracts would be broken and that competition would reduce the amount of revenues if rates were increased are clearly erroneous. Each error will be addressed separately, although it must be noted that they all are inter-related to some degree.

A. *The bankruptcy court failed to apply the "willing seller" aspect of the willing buyer—willing seller valuation standard:*

The bankruptcy court squarely stated that "[v]alue is a question of fact." *Wabash Valley,* 77 B.R. at 1006. As CFC points out, though, this statement is only half-correct. The standards discussed above show that findings made under an improper standard are erroneous themselves as a matter of law. As shown below, that is precisely what occurred in this case.

■ The parties agree that Wabash Valley's going concern value under §§ 506(a) and 1129(b) must be based upon its future earning capability. This methodology is mandated by the decision in *Consolidated Rock Products Co. v. Dubois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982

(1941), wherein the Supreme Court held that a plan of reorganization was improperly confirmed when the bankruptcy court failed to determine the future earning capacity of the enterprise. *Accord, Protective Committee for Independent Shareholders v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (bankruptcy court erred in considering only the present earning capacity of the debtor).

■ A central focus of this going concern value is the willing buyer—willing seller standard. The goal is to determine, on a case-by-case basis, the approximate price at which the property of the debtor would change hands between an informed seller and buyer. Such an analysis presumes that neither the buyer nor seller is under compulsion to sell, and that both are reasonably informed as to all relevant facts. *See Bankers Trust Co. v. United States,* 518 F.2d 1210, 1219, 207 Ct.Cl. 422 (1975), *cert denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); *Speck v. U.S. Through Farmers Home Administration,* 104 B.R. 1021, 1024 (D.S.D.1989); *In re Walsh,* 5 B.R. 239, 241 (Bankr.D.C.1980). The price the willing buyer would pay, and the willing seller would accept, is that which would result from an informed bargaining process. *See In re Valuation Proceedings Under Sections 303(c) and 306 of the Regional Rail Reorganization Act,* 531 F.Supp. 1191, 1217–18 (Reg.Rail.Reorg. Ct.1981).

To determine going-concern value, the bankruptcy court had to take into account all considerations that the parties might fairly bring forward and give substantial weight in their bargaining. *United States v. 429.59 Acres of Land,* 612 F.2d 459, 462 (9th Cir.1980). Such a valuation can presume "neither incorrigible optimism nor confirmed pessimism on the part of the participants." *Estate of Tully v. United States,* 41 A.F.T.R.2d (P–H) ¶ 148,219, at 78–1477, 1978 WL 3453 (Ct.Cl.1978). The court "should not use that value which would be obtained through a forced or quick sale." *In re Courtright,* 57 B.R. 495, 496 (Bankr.D.Or.1986).

As one federal court has explained in discussing the willing buyer—willing seller standard, the " 'willing buyer' and 'willing seller' whose judgment the court is charged to simulate are hypothetical persons—constructs of the law." *Wallace v. United States*, 566 F.Supp. 904, 910 (D.Mass.1981). Such hypothetical characters "are attentive to expert advice, but they know that experts often differ." *Id.* "In the end, they test the experts' advice, and formulas ... to bolster their advice, against common sense." *Id.* at 910–11. "The final figure on which the hypothetical willing buyer and willing seller would agree is likely to be one within a range the formulas help to define but may be different from the figure produced by any of the formulas advanced by expert witnesses." *Id.* at 911.

■ This "calls for an evaluative determination by the factfinder, not a precise calculus from authoritative premises and ascertained facts." *Id.* In the end, "[t]he final determination of value ... may be, and usually is, not a calculation by formula but a judgmental choice about the relative weight to be given to factors reflected in different sets of proposed assumptions inherent in different formulas advanced by expert witnesses and counsel." *Id.* This does not mean that it is error to select and adopt a particular expert's opinion, for that, in and of itself, is appropriate if supported by the evidence. *See, e.g., In re Phoenix Steel Corp.*, 39 B.R. 218, 229 (D.Del.1984) (court accepted and used one expert's methodology). It simply means that the willing buyer—willing seller standard requires evaluation and consideration of the assumptions and methods used by both sides.

■ In this case the bankruptcy court purported to apply this standard with a view toward the seller operating the enterprise as an integrated, income-producing enterprise. A review of the opinion, however, reveals that, as the lower court itself wrote, the focus below was on the "assumptions the *willing buyer* would make and the risks the *willing buyer* would perceive." *Wabash Valley*, 77 B.R. at 1006 (emphasis added). The court never viewed the valuation from the seller's side to determine the strengths of Wabash that the seller would bring to the bargaining table.

At each stage of its opinion, the lower court concentrated only on the buyer's perceptions and in essence determined what the buyer's first offer might be. For instance, when speaking of the enforceability of the all-requirements contracts, the court defined the focus as "whether a willing buyer would perceive a risk that the contracts are voidable and alter its offer accordingly." 77 B.R. at 1006. By using this legal standard, the bankruptcy turned risk into certainty without making any effort to determine the *level or amount* of the risk involved and how it would impact the buyer's and seller's perspectives. It is undisputable that there is some risk that any type of contract might be voidable, but this alone is meaningless. The necessary inquiry is how great that risk is in the matter at hand. The lower court, however, asked only whether the buyer would perceive "a risk," and in so doing committed legal error.

Similarly, when evaluating whether rates could legally be increased (with a resultant increase in value), the bankruptcy court considered only the buyer's view of whether a large rate increase, such as the 51% "sought" by Wabash in its Rate Case, could be obtained. In so doing the court ignored the possibilities that Wabash might be able to obtain a more modest rate increase. Thus, the bankruptcy court's valuation was based on a 100% assumption that no rate increases and no recovery of the Marble Hill debt service could be had, even though there are legitimate arguments to the contrary. Indeed, as discussed below, the bankruptcy court never actually analyzed the government's valuation of $495,-000,000 from Case A–1, which involved modest annual rate increases of 4%, but instead dealt only with Case A–2, which assumed an initial rate increase of 21%.

A final indication that the bankruptcy court looked only through the eyes of the buyer comes simply from a review of the language used throughout the opinion. In describing the decision-making process in-

volved in a going concern valuation, the bankruptcy court repeatedly made unilateral references to what the "willing buyer" or the "prospective purchaser" would assume, but did not once inquire as to what the "willing seller" would posit. Indeed, the lower court specifically used the terms "willing buyer" or "prospective purchaser" at least 40 times in its opinion.[4] The term "willing seller," in stark contrast, appears only once, and that is in making a passing quotation from one of the government's exhibits. *See* 77 B.R. at 1020.

The point, of course, is not that trial court opinions must contain an equal number of "willing buyer" and "willing seller" references. Indeed, even if the bankruptcy court had done that in this case the outcome would still be the same. In this instance, the repetitive and unilateral use of the willing buyer term simply confirms that an improper legal standard was applied below.

The law requires that Wabash be valued on a going concern basis as if it were to continue to earn revenues in the future; Wabash is not to be valued as if it were being rummaged at a forced sale. By viewing the valuation solely through the eyes of the buyer and failing to consider the strengths that the seller would bring to the bargaining table, the bankruptcy court in essence created a forced sale and applied an inappropriate legal standard. Remand is thus required as a matter of law for the application of the proper valuation standard.

B. *The bankruptcy court wholly failed to consider the government's Case A–1 mid-level valuation:*

In making its appraisal of Wabash Valley, the government proffered two different sets of assumptions. First, in Case A–1, which yielded a value of $495,000,000, the government assumed 4% annual rate increases. Then, in Case A–2, the government assumed an initial 21% rate increase and annual 4% increases thereafter, result-

ing in a value of $895,000,000. In both instances the government used a discount rate of 7.434%, and assumed that the power contracts would not be broken and that customers would continue to buy power through Wabash Valley.

In reviewing the government's valuations, however, the bankruptcy court analyzed only Case A–2, and wholly failed to consider the modest rate increases assumed in Case A–1. Even a cursory reading of the opinion shows that this is true. For instance, in its introduction to its critique of the government's valuation, the lower court stated that a willing buyer would reject Lindsay's valuation because the buyer would not assume "that it could obtain a future *large* rate increase to recover the Marble Hill debt." 77 B.R. at 1007 (emphasis added). Additionally, the court wrote that the buyer would "perceive a significant risk that a *large* increase in rates, even if legally permissible, would result in a decline in the future stream of revenue....." *Id.* (emphasis added). Thus, from the very start of its analysis of the government's case, the bankruptcy court concerned itself only with large rate increases, and thus focused solely on Case A–2.

The rest of the decision proves this premise to be true. Concerning rates again, the court stated that the "willing buyer would perceive a significant risk that the PSC decision in the Rate Case will be upheld." *Id.* at 1008. Yet, the Rate Case involved a request for a 51% rate increase, some 30% more than that posited in Case A–2, and 47% more than assumed in Case A–1.

Similarly, the bankruptcy court later spoke to the effects a "large rate increase" would have on revenues. The court wrote:

Even if the willing buyer presumed that it could legally raise the rates charged to Wabash's members *as high as proposed by Lindsay in Case A–2*, a willing buyer would not offer to purchase Wabash based upon the assumption of such a *large increase*, because a

---

**4.** *See* 77 B.R. at 1006, 1007, 1008, 1009, 1010, 1011, 1012, 1013, 1014, 1016, 1017, 1019, 1021, and 1022.

buyer would perceive a significant risk that the *large rate increase* would result in a decline in the stream of anticipated revenues.

77 B.R. at 1009 (emphasis added). Even assuming arguendo at this stage that the bankruptcy court's finding here is not clearly erroneous, it is immediately apparent that the court was only concerned with the "large rate increase" assumed by the government in Case A–2.[5]

Noticeably absent from the opinion is any discussion of the validity and effects of the assumptions made in Case A–1. Yet, the bankruptcy court itself seemed to unknowingly approve of some of the assumptions made in Case A–1. For instance, the court stated that the elasticity derived by the government in Case A–2 "may not be constant for all levels of price increases." *Id.* at 1010. Thus, by the lower court's own reasoning, elasticity would be more favorable at a lower rate increase such as that posited in Case A–1.

The bankruptcy court also noted that two of Wabash's own experts assumed that Wabash could raise rates in order to achieve a return on its investment, but that those rates would be competitively limited to rates charged by neighboring IOUs. *Id.*

at 1020. Yet, the record is clear on the point that the increases assumed in Case A–1 would not even approach those charged by neighboring IOUs such as NIPSCO. Thus, some of Wabash Valley's own evidence shows that Case A–1 is a legitimate valuation that must be analyzed, regardless of whether Wabash would or would not be able to recover any of its Marble Hill debt.

The lower court, however, focused squarely on the government's Case A–2. Why it did so is unclear, for a review of the transcript in this case shows that the government did not devote an inordinate amount of time to Case A–2 in its presentation as compared to the time it spent on Case A–1. In any event, Case A–1 is competent evidence that cannot be ignored. It assumes small rate increases, something that is at least a substantial possibility, and assumes continued growth in revenues, which the historical evidence shows is highly probable. The factfinder may reasonably determine, after reviewing the evidence, that Case A–1 has faults.[6] But the factfinder must first actually consider the Case A–1 before it can be dismissed out of hand. No such evaluation occurred below. Meaningful appellate review is thus impos-

---

**5.** The lower court did this throughout its opinion without any discussion of the feasibility of Case A–1. For instance, at one point the court wrote, "Stone's forecast may understate the effect of a *large price increase*," and a "rate increase greater than 21% may produce changes in consumer demand that would not be offset by customer growth." 77 B.R. at 1010 (emphasis added).

The following passages from the opinion further demonstrate that the lower court only addressed Case A–2:

—The "number of future customers Stone hypothesized after a 21% rate increase might be overstated." *Id.* at 1011;

—"Many of Wabash's customers are already disgruntled with Wabash's rates, and would likely press for relief from any *large rate increase*." *Id.* (emphasis added);

—The willing buyer would reject the presumption that an increase in customers would offset the price elasticity of demand "after a *large rate increase*" because the government's elasticity figure assumes REMCs will buy from Wabash "even after a *large rate increase*...." *Id.* (emphasis added);

—"Lindsay has proposed a rate increase scenario and a resulting valuation of over $800,000

that might not apply to any IOU which would purchase Wabash...." *Id.* at 1014;

—"Confronted with those risks, a willing buyer would make certain assumptions when valuing Wabash. Most importantly, the willing buyer would assume that it could not raise rates charged the REMCs sufficiently to repay *all* of the Marble Hill debt." *Id.* at 1022 (emphasis added).

**6.** Indeed, Case A–1 is at least technically inaccurate to the extent that it assumes annual rate increases, for the record shows that a rate request can only be filed every 15 months. This technicality, however, certainly does not destroy the study's validity, for the 4% annual increases can be treated as averages. Such an inconsistency goes to the weight and not the admissibility of the evidence.

Case A–1 also assumes that the 4% increases would be used to track inflation, but the record shows that the variable costs that are inflation sensitive in the short run comprise only a portion of Wabash's total costs. This tends to show that rate increases might not necessarily match the inflation rate over the short term.

sible, and remand is required for a full evaluation of this relevant evidence.

C. *The bankruptcy court's implicit finding that the willing buyer would assume that rates could not be increased at all is clearly erroneous:*

 The bankruptcy court stated that a willing buyer would assume that the Rate Case decision and the *NIPSCO* case prevent Wabash from "raising rates to recover the Marble Hill debt." 77 B.R. at 1008. This finding, standing alone, is probably appropriate if the lower court was speaking in terms of recovering all of the Marble Hill debt, for there is at least a great risk, in light of the Rate Case decision and the *NIPSCO* opinion, that Wabash would not be able to secure higher rates to recover all this debt.

Implicit in the lower court's opinion, however, is the finding that the willing buyer would determine that Wabash cannot obtain any rate increase that might result in the recovery of even a portion of the Marble Hill debt. This is so because the bankruptcy court never addressed the possibility of Wabash obtaining, say, a series of 4% rate increases as posited in Case A–1. The lower court thus made the rate increase aspect of the valuation an all-or-nothing proposition. The record, however, shows that such a finding is clearly erroneous.

First, the historical evidence reveals that Wabash has obtained rate increases in the past. Second, several of Wabash's own experts assumed that Wabash would be able to obtain rate increases to allow a return on investment.

Finally, as to the possibility that rates can be raised to pay for part or all of Marble Hill, the only evidence in the record is the decision in the Rate Case and the *NIPSCO* decision. There is no administrative or judicial decision squarely addressing, for instance, whether Wabash can obtain a 4% increase that will have the practical effect of recovering some portion of the Marble Hill debt.

Thus, the willing buyer and seller are left with legal interpretations of relevant statutes and precedents. Unfortunately,

and surprisingly, neither side offered expert legal opinions on this issue below. Nonetheless, as the Utility Commissioner noted in the Rate Case decision, the *NIPSCO* case involved an investor owned utility, whereas Wabash is owned by its ratepayers. The Utility Commissioner recognized that a paradox thus exists in Wabash's case as the *NIPSCO* decision was based on the premise that nonowning ratepayers cannot be forced to pay for cancelled projects.

Wabash has consistently argued that this case is about valuation, not rates. Although true on a superficial level, this proposition overlooks the fact that when valuing a regulated business, rates necessarily become one of the key factors in the valuation. The bankruptcy court was required to make some determination as to how the hypothetical buyer and seller would view Wabash's prospects of obtaining any level of rate increases. The court, however, only looked at high rate increases aimed at recovering all the Marble Hill debt. There is evidence in the record tending to show that there is at least a reasonable probability that moderate rate increases can be obtained. The bankruptcy court failed to address this evidence, and its all-or-nothing finding is thus clearly erroneous.

D. *The bankruptcy court's findings that the willing buyer would assume that the all-requirements contracts would be broken and that revenues would decrease with rate increases is clearly erroneous:*

 The bankruptcy court found that a willing buyer would assume that the all-requirements contracts would be broken and that revenues would decrease with rate increases. Both these findings lack support in the record and are clearly erroneous.

First, all the evidence in the record unequivocally supports the conclusion that the all-requirements contracts are legally binding. It is undisputable that all 24 REMCs entered into these 40 year contracts in order to induce the REA to loan

Wabash significant sums of money. The contracts appear proper in all respects on their face, and Wabash did not even attempt to show otherwise. Although reaffirmance of a contract is certainly not required for a contract to remain valid and binding, there are board resolutions from at least 18 of the 24 REMCs reaffirming the all-requirements contracts.

The evidence shows that the REA has used such contracts on over 700 occasions. Although several challenges have been made to the contracts, none has been successful in proving that all-requirements contracts can be avoided.[7] To the contrary, the record, such as the multi-million dollar verdict in the *Shoshone River* breach of contract case, shows otherwise. The record also shows that such contracts have been disclosed in successful bond issuings. The testimony of the REMC directors also shows that each director considers the contracts binding.

In opposition to this, Wabash offered only the testimony of several of the directors who stated that if the Marble Hill debt were their responsibility, they would attempt to break the contracts. No REMC, however, has formally studied the feasibility of such action. Wabash's own experts admitted that the enforceability of the contracts is a legal question, and they noted that a buyer would obtain legal counsel to address this issue. Yet, Wabash did not offer any expert legal opinion on the matter.

In short, the record in this case conclusively shows that the willing buyer and willing seller would conclude that there is very little chance of the all-requirements contracts being breached without significant and cost-prohibitive ramifications. Lay testimony that some effort might be made to avoid the contracts is not probative as to the legal aspects of the issue, yet such lay testimony is all that Wabash has on its side. The lower court's finding on this issue is thus clearly erroneous.[8]

Second, the bankruptcy court also erred in finding that revenues would decrease with rate increases. Once again, the problem here relates to the court's focus on the government's Case A–2 involving a large rate increase to cover all of the Marble Hill debt. The findings concerning elasticity all dealt with large rate increases, but the record shows that revenues may well continue to rise with modest changes in price. Indeed, the historical evidence reveals that Wabash's revenues and customer base have consistently grown, even after rate increases.

The bankruptcy court also overlooked the evidence that 50% of Wabash's revenues come from the use of lights and appliances as opposed to heating and cooling. The court failed to note that 20% to 24% of Wabash's power is purchased by non-residential customers who are less sensitive to rate increases, and did not take account of the fact that it is the exception rather than the rule that residential customers can obtain natural gas in their rural areas. Moreover, even if they could get natural gas or decided to switch to propane gas, these customers would have to incur the start-up costs of buying new equipment. Yet, if the willing buyer and seller accept the debtor's view that the REMC customers are experiencing financial difficulties, it is unclear how these customers would be able to make such changes.

In short, there is insufficient evidence in the record to support a conclusion that revenues will decrease at all levels of price increase, yet that is the essence of the bankruptcy court's finding regarding elasticity. As such, the finding was clearly erroneous.

---

7. One decision apparently found that, under the relevant state's statute, the entities did not have the authority to enter into such contracts. In today's case, however, there is no suggestion that the member REMCs lack such authority.

8. The bankruptcy court's finding that the REMCs might be able to avoid their contracts in bankruptcy court is also unsupported by the record. Moreover, as the government argued in its brief without refutation, if a debtor is not financially distressed and is able to pay its debts as they come due, the bankruptcy petition will be dismissed for lack of good faith. The evidence in this case shows that all the REMCs are in good financial health, and will likely stay that way in the future.

774

E. *The bankruptcy court made other unrelated errors that must be corrected on remand:*

Beyond these major problems, the bankruptcy court made several other findings and statements that do not find support in the record. This Court will briefly summarize these matters so that they are not repeated on remand.

■ At one point the lower court criticized the government's models because they "cannot account for any new technology which might provide another substitute for electricity purchased from Wabash, or which makes existing technology more palatable and thereby alters the cross-price elasticity between elasticity and the existing alternatives." 77 B.R. at 1010. Of course, Wabash's models suffer from the same defect, but beyond this, there is absolutely no evidence in the record suggesting that there is any "new technology" that willing buyers and sellers would take into account. The new technology statement is thus improper.

■ Later, when discussing elasticity, the lower court stated that customers "will not accept any reversal" of the Rate Case decision. The court went on to say that the REMCs could "agitate for simple amendment of the statute which gives an REMC its monopoly, and amendment could allow individual members to flee their REMCs for IOUs or municipal suppliers." 77 B.R. at 1011. The court also stated that the customers could challenge the REMCs monopoly on the grounds that "adequate service" was no longer being provided as is required by Indiana statute.

Such statements, however, overlook the reality that the customers might well have to accept a reversal of the Rate Case decision if that were the Indiana Supreme Court's decision. As the bankruptcy court itself noted in trying to show that the retail customers are different from stockholders, "An REMC member ... has no stock to sell, *and can only escape the burden of paying the cancellation costs by moving or by somehow securing a different source of electricity.*" 77 B.R. at 1011 n.

22 (emphasis added). These same customers were presumably willing to accept substantial rate increases to finance Marble Hill, so it is not implausible that they would still accept such price changes today. Moreover, as Wabash's own general manager stated in a public announcement, a phase-in of rates resulting in an increase of 10% is "an increase our people can live with if rates must go up...."

Moreover, the speculative statements that a "simple amendment" to the Indiana statutes could be effected is without any support whatsoever in the record. The transcript contains no testimony concerning this issue, and this Court is unaware of any authority that allows federal judges to take judicial notice of their views of the politics of a given situation. Finally, the theory that the legislative monopoly could somehow be avoided by arguing that the REMCs are not providing "adequate service" as provided in the statutory scheme is also without any evidentiary support in the record.

■ Additionally, the lower court's finding that the government's figures do not provide a true going concern value is unsupported by the record. The purpose of a valuation under § 506(a) of the Code is to determine whether all or part of a secured creditor's claim will be secured and whether any of it will be bifurcated into the unsecured claims. If the valuation shows that the entire claim is secured, then there is no reason for the valuation to proceed any further. In light of this statutory mandate, the government's experts cannot be faulted for seeking to determine the level of rate increase that is required to make all of the government's claims secured. Moreover, the bankruptcy court again failed to consider the government's mid-level Case A–1. Thus, the finding that the government's experts did not provide a going concern valuation is without support in the record.

■ Finally, there is the tariff issue. The bankruptcy court made the following finding on this matter:

On the whole, the witnesses testifying for Wabash seemed more convinced of the tariff's existence than REA's wit-

nesses seemed convinced that the tariff did not exist. The Court believes that the tariff is on file, should be on file, or that the members in the NIPSCO area could wheel power over NIPSCO's lines after some legal wrangling.

77 B.R. at 1016. This is a curious issue, for without the tariff it is clear that the REMCs would not be able to wheel power over NIPSCO's lines. Thus, a tariff is needed for NIPSCO-area REMCs to secure power from alternative suppliers if the REMCs are somehow able to avoid their all-requirements contracts and seek other supplies. Yet, the debtor never produced the purported tariff at trial even though its general counsel stated that it would be in the office files. Then, at oral argument on this appeal, debtor's counsel admitted that to this day he does not know if there is such a tariff that would allow the REMCs to wheel over NIPSCO's lines. Counsel added, however, that this issue had been blown out of proportion because tariffs are routine and one could be easily obtained.

The record demonstrates that while Wabash's general manager testified that a tariff "should" be on file and general counsel Morton stated that he thinks the tariff exists, no such tariff was introduced. In opposition to this oral testimony, William Lindsay of the FERC, which has jurisdiction over tariffs, stated that NIPSCO has no such tariff on file of which he is aware.

At trial and in its appellate brief, the government objected to Wabash's oral testimony concerning the tariff without the introduction of the document itself. The government relies on Rule 1002 of the Federal Rules of Evidence, which reads as follows: "To prove the content of a writing ..., the original writing ... is required, except as provided in these rules or by Act of Congress." Fed.R.Evid. 1002. The question in each case, then, is whether the "content" of the purported document is sought to proven. *Advisory Committee's Note to Rule 1002.* Because of the fact-sensitive nature of this inquiry, each case tends to be decided on its own merits and rulings from other situations are generally of little use as precedents. 4 *Wigmore on Evidence* § 1242 at 574 (1972).

■ In this instance, the obvious answer to this question is that Wabash did seek to prove the contents of the tariff. Specifically, Wabash, which apparently had the initial burden of proof on this and all aspects of the valuation,[9] sought to use the tariff issue to show that its NIPSCO area REMCs could buy inexpensive power from other suppliers and have it wheeled over NIPSCO's lines. It sought to prove not just that a tariff was on file. To the contrary, it wanted to establish that the tariff in question applied not only to partial-requirements municipals, but also to all-requirements REMCs. Thus, Wabash needed to prove the terms of the tariff purportedly on file with the FERC in order to show that REMCs in the NIPSCO area would be able

---

**9.** Nowhere in the decision below was the burden of proof allocation addressed. Similarly, the parties themselves have not addressed this in their briefs. At oral argument the Court inquired of CFC's counsel whether he knew which party had the burden of proof below. Counsel replied that he thought Wabash had the burden, which response drew a look of disagreement from Wabash's counsel. A review of the law in this area shows that the parties' disagreement and inability to cite precedent on this matter is not surprising.

The Court has attempted to locate authority on this issue, but has only located two cases. One, *In re Loss,* 27 B.R. 118, 119 (Bankr.W.D.N.Y.1983), merely states that the "burden of proof primarily is upon the debtors to establish the value of their assets." The other case, *In re Ravena Associates,* No. 80–CV–556, slip op. (N.D.N.Y. Aug. 28, 1981) (available on LEXIS), recites that the debtor in that instance agreed

"that it ha[d] the burden of proving an appraised value of less than the secured value of the property." Beyond these brief passages, the Court has been unable to find any cases, commentary, nor other authority on the question.

This Court agrees, though, that the debtor has the initial burden of proof in this situation. Each side has an interest in establishing their own valuation, and it is the debtor who must first demonstrate by a preponderance of the evidence that the collateral is worth less than the secured claims. As the Seventh Circuit has recently noted in an unrelated context, "[T]he party who would lose if no evidence were presented has the burden [of proof]." *Auburndale State Bank v. Dairy Farm Leasing Corp.,* 890 F.2d 888, 893 (7th Cir.1989). If the movant-debtor presented no evidence, it would not be entitled to the protections of Chapter 11. Thus, Wabash had the initial burden of proof below.

to seek an alternative supplier other than NIPSCO, which has rates more than 50% above Wabash's present rates.

Under Rule 1002, by failing to produce the document itself or offering any explanation for its failure to do so, Wabash failed to meet its burden. *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 63–65 (3d Cir.1984) (party failed to meet burden of producing copy of document or offering an explanation for its absence); *Burroughs Wellcome Co. v. Commercial Union Insurance Co.,* 632 F.Supp. 1213, 1223 (S.D.N.Y.1986) (party seeking to prove contents of document must proffer an explanation for failure to produce original or duplicates of document). The government properly preserved the evidentiary error below. Thus, the bankruptcy court's findings that the tariff is or should be on file is based upon inadmissible evidence and is contrary to law.

■ Moreover, the lower court's suggestion that such a tariff could be obtained by "legal wrangling" is unsupported by the record and is pure speculation. If NIPSCO has a surplus of power as suggested by Wabash, then NIPSCO would no doubt want to actually supply to the REMCs rather than wheel another supplier's power over its lines. This, of course, just like the "legal wrangling" suggestion, is wholly speculative. The point is that the trial court's findings in this case must be based on evidence adduced at trial, and not on a judge's own personal view of what might or might not happen.

### VI. Conclusion:

In sum, the bankruptcy court's valuation was based on an improper application of an erroneous legal standard. The lower court did not actually accomplish what it set out to do, but instead turned assumptions based on the existence of even slight risk into absolute certainties. At all stages the bankruptcy court ignored the strengths of Wabash Valley that the willing seller would bring to the table, bypassed the "give and take" of negotiation that would occur in an actual sale, and in some instances even made findings that lacked any evidentiary support in the record.

As a result, the decision below must be set aside, and this cause must be remanded to the bankruptcy court for further consideration consistent with this opinion.[10] It must be noted that the bankruptcy court's findings concerning the appropriate inflation and discount rate are not disturbed on appeal, nor does this opinion affect the finding that Case A–2 presented by the government is an excessively high valuation because it assumes that all of the Marble Hill debt could be recovered.[11] Today's decision does not necessarily mean that a valuation in the low $200,000,000 range is inappropriate anymore than it means that a valuation in the $500,000,000 area is proper. Rather, it simply means that the trier of fact's valuation must be made by using the proper legal standard, by making reasonable estimates of the risks faced by both sides, and by strictly confining the decision to the evidence contained in the record below and that produced in any additional court hearings.

IT IS SO ORDERED.

---

10. The Court notes that the government has requested that this Court withdraw the reference to the bankruptcy court and proceed to make its own findings or order further proceedings as seen fit. At the time the briefs were filed in this case, this was an excellent suggestion as the author of the bankruptcy court's opinion had stepped down from the bench and no bankruptcy judge was familiar with this case.

Since that time, however, and due in part to the time it took this Court to reduce the backlog in its docket and address this appeal, Judge Vandivier has recently held a confirmation hearing and is familiar with the case. At this stage, then, it appears that it would be more efficient to allow the bankruptcy court to consider this opinion and proceed to make a new valuation. Thus, absent a new motion from an interested party, this Court will not withdraw the reference to the bankruptcy court.

11. The parties, however, are free to present new or additional evidence to the bankruptcy court on remand on these and all other issues.